IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EAGLE VALLEY CLEAN | ) | Case No. 24-11903-MER |
| ENERGY, LLC | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |

---

**TRUSTEE'S OBJECTION TO PIC GROUP, INC.'S MOTION FOR RELIEF FROM AUTOMATIC STAY TO TERMINATE OPERATIONS AND MAINTENANCE SERVICES AGREEMENT**

---

Jared Walters, the Chapter 7 Trustee (the "Trustee"), by and through his counsel Sherman & Howard L.L.C., objects to the Motion for Relief from Automatic Stay to Terminate Operations and Maintenance Services Agreement (the "Motion") filed by PIC Group, Inc. ("PIC") on April 30, 2024 (Docket No.14).  In support, the Trustee states as follows:

### INTRODUCTION

1.      The gist of the Motion is that the Trustee does not have access to unencumbered funds sufficient to pay PIC pursuant to the terms of the Agreement.[1]  The Motion is premised on two incorrect assumptions.  First, the estate has sufficient funds to pay PIC for the reasonable value of its post-petition services.  Among other things, Trustee is negotiating with the senior secured creditor to allow the use of cash collateral and to conduct a sale process of encumbered and unencumbered assets that will allow the Trustee to pay administrative expenses and make a distribution to unsecured creditors.  Second, the compensation owed to PIC under the Agreement does not establish the reasonable value of the services PIC has provided to the estate post-petition.

2.      As demonstrated below, PIC has not established cause for relief from stay.  The Motion should be denied.

### BACKGROUND

3.      On April 17, 2024 (the "Petition Date"), Eagle Valley Clean Energy, LLC (the "Debtor") filed a voluntary petition under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above-captioned bankruptcy case.

4.      The Trustee is the chapter 7 trustee for the Debtor's bankruptcy estate.

---

[1] Capitalized terms not defined in this Objection shall have the meaning given to them in the Motion.

5.      Prior to the Petition Date, the Debtor owned a biomass power plant (the "Facility") located in Gypsum, Colorado.  The Facility generates power by burning biomass fuel, *i.e,* wood from sawmill and forest-source residuals.

6.      The Debtor sold the electricity generated at the Facility to Holy Cross Energy.

**<u>The Agreement</u>**

7.      PIC Group operated the Facility pursuant to an Operations and Maintenance Services Agreement By and Between Eagle Valley Clean Energy, LLC and PIC Group, Inc. dated March 17, 2021 (the "Agreement").  A copy of the Agreement is attached to this Objection as Exhibit A.  The Agreement expires by its own terms on May 31, 2024.  (Agreement, ¶ 6.01.)  Under the Agreement, PIC is compensated as follows:  (a) an initial transition fee; (b) a monthly transition fee; (c) an annual management fee; (d) an incentive fee; (e) a labor payment that includes an additional 11.5% for workers compensation, liability insurance, and general and administrative  costs; and (f) payment of reimbursable costs as defined in the Agreement by a rate of 1.06.  (*Id.,* ¶ 5.01.)

8.      The Labor Payment is invoiced in advance for two months, and the invoice is to be paid within 30 days of receipt.[2] (*Id.,* ¶ 5.02(d).)

9.      In the event of termination by the Operator prior to the expiration of the Agreement, the Owner is required to pay the Operator (a) all payments due under the Agreement; (b) a demobilization payment equal to the total of all the reasonable costs and expenses incurred by Operator as a result of such termination, including relocation costs, Labor Costs, and Labor Burden incurred with respect to Operator's Facility Work force and any cancellation costs incurred with respect to third-party contracts, and (c) the three-month pro rata portion of the then-current Annual Management Fee. (*Id.,* ¶ 6.02(b).)

10.      The amounts identified in paragraph 10 would not be paid to the Operator if the Agreement were to expire in accordance with its own terms, *i.e.,* in about two weeks.  The Trustee submits that PIC may be motivated to terminate the Agreement two weeks before it expires based on a desire to try to inflate its own claim to the detriment of other unsecured creditors.

11.      The Agreement requires PIC to provide 30- day notice of material breach in order to terminate.  Thus, even if the Court were to grant the Motion (it should not), the Agreement would have expired by its own terms before the termination would be effective.

12.       The Trustee has asked PIC to provide to the Trustee a list of all amounts PIC asserts it is owed post-petition.  PIC has not provided that information to the Trustee as of the filing of this Objection.

---

[2] The Trustee reserves all rights to recover from PIC any amounts paid in advance for services that have not been performed.  The Trustee also reserves all rights to seek to recover any compensation paid to PIC that was excessive, as well as payments that may be avoidable as preferential transfers.

2

13.     The Trustee asserts that PIC is entitled to be compensated for the reasonable value of the services it has provided post-petition, which would appear to be far less than the compensation described in paragraph 8.

**Estate Cash and Assets**

14.     Counsel for RUS has stated that it is willing to allow the use of cash collateral for reasonable amounts necessary to preserve the Facility.[3]  Even without the consent of RUS, the Trustee would surcharge RUS for these amounts under section 506(c) of the Bankruptcy Code.

15.     In addition to the Facility that RUS asserts is encumbered by its mortgage, the estate owns a 75 acre parcel that is not subject to the mortgage of the RUS.  RUS does not assert that its mortgage encumbers the 75 acre parcel.

16.     The RUS and the Trustee are negotiating the terms pursuant to which the Trustee will sell the assets of the estate.

17.     The Trustee has been informed by the Debtor and its insurance broker that the insurance required of the Owner by the Agreement is in place.  While it is not clear to the Trustee whether the waiver of subrogation is in place with respect to property insurance, the Trustee is informed that issue is being reviewed by the insurance broker. The Trustee expects to have evidence of the required insurance in the coming days.  Upon information and belief, PIC did not object to the suppose inadequate insurance coverage prior to the Petition Date.  To the extent any insurance may not be in place, the Trustee asserts that would not be a material breach entitling PIC to terminate the Agreement, particularly because the Facility is not operating post-petition.[4]

## ARGUMENT

18.     PIC argues it should be granted relief from stay because the Debtor filed a chapter 7 bankruptcy petition and has ceased operating (Motion, ¶ 12), the Debtor has not maintained the proper insurance required by the Agreement (id., ¶ 15), the Debtor may not be able to honor its indemnity obligations (id., ¶ 16), and there is no equity in the Agreement based on the oversecured claim of the senior secured creditor (id., ¶ 17).[5]  PIC is wrong on all counts.

19.     Without citation to any authority, PIC seeks relief from stay to terminate the agreement because the Debtor filed a chapter 7 bankruptcy petition and has ceased operations. Motion, ¶ 12.  PIC's argument does not establish cause for relief from the automatic stay.  A chapter 7 bankruptcy filing and the cessation of operations is not cause for relief from the automatic stay to terminate a contract.  To the contrary, *ipso facto* clauses are unenforceable.  11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B); *In re Mirant Corp.,* 303 B.R. 319, 334 (Bankr.N.D.Tex

---

[3] The Trustee currently has in excess of $900,000.00 in the estate's bank account and expects to receive a substantial payment from Holy Cross Energy in the coming days.  The Trustee does not concede that RUS has a properly-perfected security interests in all of this cash.

[4] The Trustee has requested quotes for property insurance converge for the Facility if that were to become necessary.

[5] The senior secured creditor is Rural Utilities Services, an agency of the Unted States government.

58708446.1

2003) (denying motion for relief from stay because movant cannot rely upon unenforceable *ipso facto* clause to declare default).

20.     Without any evidentiary support and without stating what PIC claims it is owed for reasonable post-petition services,[6] PIC argues that the estate has insufficient funds to pay PIC for its post-petition services.  Motion, ¶¶ 13 and 14.  This argument does not establish cause for relief from stay for at least four reasons.  First, the estate has sufficient unencumbered funds available to pay PIC the reasonable value of its services.  Second, RUS has agreed to the use of cash collateral for the reasonable value of services to secure the Facility and mitigate the fire risk.  In the alternative, the Trustee would surcharge for such amounts.  Third, under the Agreement, PIC invoices for Labor Costs two months in advance and is paid one month in advance.  PIC may have already been paid for much of its alleged services.  Fourth, the Trustee disputes that the other compensation to PIC under the Agreement has provided any benefit to the bankruptcy estate.

21.     PIC argues that it is entitled to relief from stay because the Debtor did not obtain the proper insurance coverage.  Motion, ¶ 15.  Upon information and belief, the Trustee asserts the proper insurance was provided by the Debtor.  It does not appear, and PIC does not allege, that PIC complained about the insurance coverage until after the bankruptcy petition was filed.  Perhaps most importantly, the Trustee will have adequate insurance coverage on a post-petition basis.  The insurance coverage required under the Agreement does not determine the insurance coverage the estate needs.

22.     PIC argues that the estate may not be able to honor alleged indemnity obligations under the Agreement.  This argument is speculative because PIC does not identify an existing indemnity claim.  Further, because the facility is not operating post-petition, any indemnity claim would be based on prepetition conduct.   Where, as here, an indemnity claim is based on a prepetition contract and prepetition conduct, the claim is a general unsecured claim.  *See, e.g., In re Consolidated Oil & Gas, Inc.,* 110 B.R. 535, 538 (Bankr. D.Colo. 1990)(denying administrative expenses claim for indemnification based on prepetition conduct).

23.     PIC also argues the estate will not be prejudiced if stay relief is granted because RUS is oversecured, and there is no equity in the assets for the benefit of the estate.  Motion, ¶ 17.  PIC is incorrect.  The Trustee is negotiating with the RUS to finalize an agreement pursuant to which the Trustee will sell encumbered and unencumbered assets that, together with unencumbered funds, will allow the Trustee to pay administrative expenses and make a distribution to unsecured creditors.

24.     PIC fails to justify its request that the Court waive the 14-day stay imposed by Fed.R.Bankr.P. 4001(a)(3).  If the Court were to grant the Motion, that request should be denied.

WHEREFORE, the Trustee requests that the Court enter an Order denying the Motion and granting additional relief to the trustee as is appropriate.

---

[6] The declaration filed in support of the Motion does not address any of the material factual issues.

58708446.1

Dated this 10th day of May, 2024.

SHERMAN & HOWARD L.L.C.

*s/ Peter A. Cal*
Peter A. Cal
675 Fifteenth Street, Suite 2300
Denver, Colorado 80202
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940
E-mail:  pcal@shermanhoward.com

**Attorneys for Jared Walters, as the Chapter 7 Trustee**

58708446.1

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2024, I electronically filed the following **TRUSTEE'S OBJECTION TO PIC GROUP, INC.'S MOTION FOR RELIEF FROM AUTOMATIC STAY TO TERMINATE OPERATIONS AND MAINTENANCE SERVICES AGREEMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Michael Schuster, Esq.
mschuster@polsinelli.com

US Trustee
USTPRegion19.DV.ECF@usdoj.gov

Annett W. Jarvis, Esq.
Carson Heninger, Esq.
jarvisa@gtlaw.com
carson.heninger@gtlaw.com

Jared Walters, Esq.
jcWalters7@gmail.com

Sara J. Baker, Esq.
sbaker@sbakerpc.com

Joli A. Lofstedt, Esq.
joli@ofjlaw.com

*s/ Roberta Neal*

# EXHIBIT A

# OPERATIONS AND MAINTENANCE SERVICES AGREEMENT

By and Between

## Eagle Valley Clean Energy, LLC

and

## PIC GROUP, INC.

Date:

MARCH 17, 2021

DocuSign Envelope ID: 5BG9E8EF520A6-458D-818A-C2A53E3F37C8

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS .................................................................................................... 3

ARTICLE 2 RELATIONSHIP OF OWNER AND OPERATOR ........................................ 9

ARTICLE 3 OPERATOR RESPONSIBILITIES ............................................................... 10

ARTICLE 4 OWNER RESPONSIBILITIES ...................................................................... 15

ARTICLE 5 COMPENSATION AND PAYMENT .............................................................16

ARTICLE 6 TERM AND TERMINATION ......................................................................... 19

ARTICLE 7 LIMITATION OF LIABILITY ...................................................................... 20

ARTICLE 8 INDEMNIFICATION ...................................................................................... 21

ARTICLE 9 OPERATOR'S REPRESENTATIONS .......................................................... 23

ARTICLE 10 OWNER'S REPRESENTATIONS ............................................................... 23

ARTICLE 11 FORCE MAJEURE ........................................................................................ 24

ARTICLE 12 INSURANCE ................................................................................................... 25

ARTICLE 13 HAZARDOUS MATERIALS INDEMNIFICATION ................................. 26

ARTICLE 14 TITLE AND RISK OF LOSS; DOCUMENTS AND DATA ........................ 27

ARTICLE 15 DISPUTE RESOLUTION .............................................................................. 27

ARTICLE 16 INTELLECTUAL PROPERTY ................................................................... 28

ARTICLE 17 MISCELLANEOUS ....................................................................................... 28

APPENDIX A – O&M SERVICES ....................................................................................... 33

APPENDIX B – Reserved .................................................................................................... 42

APPENDIX C – FACILITY WORK FORCE ..................................................................... 43

APPENDIX D – OPERATING REPORTS .......................................................................... 44

APPENDIX E – INCENTIVE FEE ...................................................................................... 45

APPENDIX F – FACILITY AND FACILITY SITE .......................................................... 48

APPENDIX G – FACILITY AGREEMENTS ..................................................................... 49

APPENDIX H – PERMITS ................................................................................................... 50

APPENDIX I – INITIAL ANNUAL BUDGET .................................................................... 51

# OPERATIONS AND MAINTENANCE SERVICES AGREEMENT

THIS OPERATIONS AND MAINTENANCE SERVICES AGREEMENT dated and effective as of March 17, 2021 (the "**Contract Effective Date**"), is hereby entered into by and between Eagle Valley Clean Energy, LLC, a company duly organized and existing under the laws of Colorado, with its principal place of business located at 10755 US Highway 6, Gypsum, CO 81637 ("**Owner**"), and **PIC Group, Inc.**, a company duly organized and existing under the laws of the state of Georgia with its registered office located at 1000 Parkwood Circle, Suite 1000 Atlanta, GA 30339 ("**Operator**") (Owner and Operator may hereinafter be referred to individually as a "**Party**" and collectively as the "**Parties**").

WITNESSETH:

WHEREAS, Owner owns the power generation facility and associated equipment that is more fully described in **Appendix F**; and

WHEREAS, Operator has represented to Owner that it is qualified to perform operation and maintenance services of the nature contemplated by this Agreement; and

WHEREAS, Owner desires to utilize the services of Operator to provide certain operation and maintenance services as set forth in this Agreement for Owner's power generation facility located in Gypsum, Colorado (the "**Facility Site**"); and

WHEREAS, Operator has agreed to perform the such services for such power generation facility subject to the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the mutual promises and agreements of the Parties herein expressed, the Parties, intending to be legally bound, hereby agree to the following:

# ARTICLE 1 DEFINITIONS

## 1.01   Certain Defined Terms

As used herein and unless otherwise expressly indicated, capitalized terms in this Agreement shall have the meanings provided herein.

"**Agreement**" means this Operation and Maintenance Services Agreement (including all exhibits, schedules and appendices attached hereto), as it may be amended and supplemented from time to time. In the event of a conflict, variation or inconsistency between the appendices hereto and the terms and conditions hereof, the latter shall control and be given priority.

"**Annual Budget**" has the meaning specified in Section 3.12(a).

"**Annual Management Fee**" has the meaning specified in Section 5.01(c).

"**Annual Operating Plan**" has the meaning specified in Section 3.12(a).

"**Annual Staffing Plan**" has the meaning specified in Section 3.12(a).

"**Applicable Law**" means any Law of any Governmental Authority having jurisdiction over the matter in question, in each case applicable to the O&M Services or the rights and obligations of a Party under this Agreement.

3

"**Change in Applicable Law**" means the adoption, promulgation, bringing into effect, repeal, amendment, reinterpretation, change in application or modification after the Contract Effective Date of any Applicable Law that establishes or modifies requirements materially affecting the performance of any of the O&M Services, or that materially changes the cost of, or the time of performance of, the O&M Services as compared to the requirements specified in this Agreement.

"**Changed Circumstance**" means, to the extent not reasonably foreseeable at the time the then current Annual Budget and Annual Operating Plan for the Facility was adopted:: (i) Change in Applicable Law, or (ii) a change in a requirement of permits or any other circumstances affecting the operation of the Facility not occasioned by Operator's negligence, gross negligence, willful misconduct or material breach of this Agreement which such change materially impairs Operator's ability to operate the Facility in accordance with the then effective Annual Budget and Annual Operating Plan.

"**Confidential Information**" has the meaning specified in Section 17.11.

"**Consumables**" means all items consumed or needing regular periodic replacement during the ordinary course of the operation and maintenance of the Facility, including, but not limited to, chemicals, water treatment items, fluids, small tools, lubricants, rags, oils, filter media, additives, fuses, fittings, connectors, seals, gaskets, sealants, and other materials required in the ordinary course of the operation and maintenance of the Facility.

"**Consumer Price Index**" ("**CPI**") means the means the Consumer Price Index (CPI for All Urban Consumers (CPI-U);

"**Corporate Office Personnel**" means those corporate office Operator personnel utilized in performance of the O&M Services from time to time, but not permanently assigned to the Facility.

"**Dispute**" has the meaning specified in Section 15.01(a).

"**Emergency**" means any urgent, abnormal, or dangerous event that (a) is existing and or is imminently likely to (i) affect the safety, health, protection or otherwise, of any persons or property located at or about the Facility, and/or (ii) create an imminent or substantial endangerment to the public or the environment and (b) require, in the good faith determination of the Operator or Owner, immediate preventative or remedial action by the Operator.

"**Environmental Laws**" means all Applicable Laws governing, regulating or relating to the environment, WCRs, public health, public safety, protected animal or plant species, cultural resources, preservation or reclamation of natural resources, pollution, waste, or the management, handling, use, storage, transportation, disposal, manufacture, distribution, formulation, packaging, labeling, Release or threatened Release or exposure of Hazardous Materials, whether now existing or subsequently amended or enacted and in effect, including but not limited to: CERCLA, 42 U.S.C. § 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. and any similar or implementing state or local Applicable Law; all amendments or regulations promulgated thereunder; and any applicable standard of conduct under any common law doctrine, including but not limited to, negligence, nuisance, or trespass, personal injury, or property damage related to or arising out of the presence, Release, or exposure to Hazardous Materials.

"**Equipment**" means, collectively, all equipment and machinery that is a part of the Facility.

"**Escalation Quotient**" means, for any Operating Year, the quotient of the CPI as of first day of the current Operating Year divided by the CPI as of the first day of the immediately preceding Operating Year; provided, however, that in no event shall the quotient be less than one (1.0).

"**Extra Work**" means any services performed or goods supplied by Operator in connection with the Facility that are not part of the O&M Services.

"**Facility**" means the Facility and Facility Site as defined in **Appendix F**.

"**Facility Agreements**" means any agreement designated in writing by Owner as a Facility Agreement and transmitted to the Operator as such agreement and may be amended, modified, supplemented or replaced from time to time. **Appendix G** lists all Facility Agreements in effect as of the Contract Effective Date.

"**Facility Site**" means the real property leased or owned by Owner on which the Facility is principally situated, as described in **Appendix F.**

"**Facility Tools**" means those machinery and tools that are owned or leased by or on behalf of Owner and are intended to be a permanent part of a Facility's inventory. Facility Tools include forklifts and other lifting devices, as well as any special tools supplied by an original equipment manufacturer to operate or maintain any equipment of the Facility.

"**Facility Work Force**" means those Operator personnel filling the positions descried in Appendix C and permanently assigned to the Facility to perform the O&M Services.

"**Fees**" means the Transition Fee, Annual Management Fee, and Incentive Fee.

"**Force Majeure**" has the meaning specified in Section 11.01.

"**GAAP**" means local generally accepted accounting principles as such principles may change from time to time and, with respect to any Person, shall mean such principles applied on a basis consistent with prior periods as reflected in the financial statements of such Person for such periods.

"**Governmental Authority**" means any federal, regional, local, tribal or municipal governmental body; any governmental, quasi-governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power; or any court or governmental tribunal. "**Hazardous Materials**" means (i) any asbestos and any asbestos containing material; (ii) any substance that is defined or regulated pursuant to present or future applicable Environmental Laws as hazardous, toxic, radioactive or polluting substance, material, contaminant, or waste, including without limitation WCRs; (iii) any petroleum and drilling fluids, produced waters or other wastes associated with exploration, development or production of crude oil, natural gas or geothermal resources; and (iv) any petroleum product, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), medical waste, chlorofluorocarbon, lead or lead-based product.

"**Indemnitee**" has the meaning specified in Article 8.

"**Indemnitor**" has the meaning specified in Article 8.

"**Incentive Fee**" has the meaning specified in Section 5.01(d)

"**Insolvent**" means that:

5

1. a Party makes an assignment for the benefit of creditors, or petitions or applies for or arranges for the appointment of a trustee, liquidator or receiver, or commences any proceeding relating to itself under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law of the country under which the insolvent Party is organized or a country in which the insolvent Party conducts business, now or hereafter in effect (collectively "**Bankruptcy Laws**"), or shall be adjudicated bankrupt or insolvent in such a country; or

2. a Party gives its approval of, consent to, or acquiesces in, any of the following: the filing of a petition or application for the appointment of a trustee, liquidator or receiver against that Party; the commencement of any proceeding under any Bankruptcy Laws against that Party; or the entry of an order appointing any trustee, liquidator or receiver; or

3. a Party is generally unable to pay its debts when due or is late in making two or more consecutive payments required under this Agreement.

"**Key Personnel**" means the Facility Work Force listed as key personnel in Appendix C.

"**Labor Burden**" means the costs associated with providing benefits to the Facility Work Force, including, but not limited to, unemployment insurance, short term disability payments, payroll taxes imposed on wages or benefits, group medical, dental and life insurance, retirement plans, other non-wage employee benefits and payroll processing fees, but excluding workers compensation, liability insurance, and general and administrative costs.

"**Labor Costs**" means all wages and compensation paid to Facility Work Force including without limitation, severance payments, bonuses, holiday and used and un-used vacation pay, all paid time off including government mandated paid time off, overtime pay and all other wage-related benefits.

"**Labor Payment**" has the meaning specified in Section 5.05(e)

"**Law**" means any decree, resolution, law, statute, act, ordinance, rule, directive (to the extent having the force of law), order, treaty, code or regulation, approval or judgment (including without limitation any Environmental Laws) or any interpretation of the foregoing, as enacted, issued or promulgated by any Governmental Authority, including amendments, modifications, extensions, replacements or re-enactments thereof.

"**Lender**" means any entity or entities providing financing for acquisition or operation of the Facility, if any, or providing credit support, if any, for such financing, and their successors and assigns.

"**Liabilities**" means any and all claims, assertions, demands, suits, damages, judgments, losses, obligations, liabilities, actions and causes of action, fees (including reasonable attorney's fees and disbursements), costs (including court costs), expenses, investigations, inquiries, administrative proceedings, civil and criminal penalties, fines, sanctions and related costs.

"**Liquidated Damages**" Commencing during the Operational Period, Operator may incur Liquidated Damages in any Operating Year in accordance with such criteria and metrics as are established in **Appendix E**.

"**Materials**" means, collectively, materials and Consumables used or consumed for the operation and maintenance of the Facility.

"**Major Maintenance**" means any repair, maintenance or overhaul of a piece of Equipment the cost of which is Twenty-Five Thousand US Dollars ($25,000.00 USD) or more.

"**Monthly Transition Fee**" has the meaning specified in Section 5.05(b).

"**Notice To Proceed**" or "**NTP**" means the written notice issued by Owner to Operator setting forth the date upon which Operator shall commence with the provision of the Transition Period Services which shall be no later than three (3) months prior to the Takeover Date.

"**O&M Services**" means the Transition Period Services and Operational Period Services.

"**Operating Standards**" has the meaning specified in Section 3.05(a).

"**Operating Reports**" means those reports required to be delivered pursuant to **Appendix D**.

"**Operating Year**" means the twelve (12) consecutive month period beginning on January 1 and continuing through December 31, inclusive, of each year during the term of this Agreement. The period between the Takeover Date and the first December 31 shall be deemed the first Operating Year hereunder. The last Operating Year shall be the period beginning January 1 and ending on the expiration date or earlier termination of this Agreement.

"**Operational Period**" has the meaning specified in Section 3.02.

"**Operational Period Services**" has the meaning specified in **Appendix A**.

"**Operator**" has the meaning specified in the Preamble.

"**Operator Indemnitees**" has the meaning specified in Section 8.02."

"**Operator's Representative**" has the meaning set forth in Section 17.12.

"**Owner**" has the meaning specified in the Preamble.

"**Owner Direct Costs**" means all costs set forth in Section 4.03.

"**Owner Indemnitees**" has the meaning specified in Section 8.01.

"**Owner's Representative**" has the meaning set forth in Section 17.13.

"**Parts**" means any part(s) or component(s) utilized for the Facility.

"**Party**" or "**Parties**" has the meaning specified in the Preamble.

"**Party Representative**" or "**Parties' Representatives**" has the meaning specified in Section 15.01(a).

"**Permits**" means (a) any license, consent, certificate, approval, permit, authorization, franchise, similar written consents and orders of any sort whatsoever by or from any Governmental Authority for the development, construction, ownership or operation of the Project and included in **Appendix H** and (b) any required notice to, or declaration, filing or registration with, any Governmental Authority, in each case in connection with the development, construction, ownership or operation of the Project and included in **Appendix H.**

"**Person**" means any individual, corporation, partnership, limited liability company, association, business, joint venture, trust, unincorporated organization, Governmental Authority or other entity.

"**Prudent Industry Practices**" means those practices, methods, and acts engaged in or approved by a significant portion of the power generation industry in the United States as good and proper, and such other practices, methods, or acts which, in the exercise of that degree of skill and diligence that would reasonably and ordinarily be expected in the power generation industry from a prudent owner and/or

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3E37C8

operator (as applicable) in light of the context and facts known at the time a decision is made, would be expected to accomplish the result intended at a reasonable costs and acting lawfully, reliably, and safely in connection with power generation facilities and equipment similar to the Facility and the Equipment.

"**Reference Rate**" means the rate published by *The Wall Street Journal* (or any successor publication) as its "prime rate" plus five percent (5%). (Subject to the limitations imposed by any applicable statute).

"**Reimbursable Cost**" means all documented out-of-pocket costs and expenses incurred by Operator in connection with the performance of the O&M Services (other than labor costs for the Facility Work Force) including without limitation: (i) Materials, supplies and all other expenditures relating to the operation, repair and maintenance of the Facility; (ii) Major Maintenance; (iii) services provided by subcontractors; (iv) utility expenses, insurance premiums, fees for accounting, legal, and other professional services required to comply with the terms of this Agreement; (v) Emergency costs and (v) travel expenses for Corporate Office Personnel.

"**Release**" means release, "threatened release" (as contemplated by CERCLA) discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or Hazardous Material into the environment so that such solid or Hazardous Material or any constituent thereof may enter the environment, or be emitted into the air or discharged into any waters, including ground waters under Applicable Laws.

"**Routine Maintenance**" means preventive, routine and minor maintenance and repairs of the Facility of a regular or minor nature that should be performed periodically in accordance with Prudent Industry Practices to keep the Facility in working order including, but not limited to, replacement of Consumables and general housekeeping, but excluding Major Maintenance which shall be considered Extra Work. Routine Maintenance is to be performed by the Facility Work Force in the course of performance of its operating duties.

"**Site Procedures**" has the meaning specified in Section 3.03.

"**Takeover Date**" means the date after which the preceding operator has demobilized from the Facility and the Owner has notified Operator in writing to commence the Operational Period Services.

"**Taxes**" means all levies, fees, charges, duties, tariffs, taxes or other charges of any nature, including without limitation sales taxes, value added taxes, use taxes, excise taxes, ad valorem taxes, consumption taxes, excise taxes, franchise taxes, import taxes, export taxes, property taxes, stamp taxes license fees and assessments imposed by a Governmental Authority other than income taxes imposed on or measured by the net income, net profits or capital of Operator. For avoidance of doubt, Taxes include gross receipts tax levied on Operator for Reimbursable Costs reimbursement.

"**Transition Fee**" has the meaning specified in Section 5.01(a).

"**Transition Period**" has the meaning specified in Section 3.01.

"**Transition Period Services**" has the meaning specified in **Appendix A**.

"**WCRs**" means all by-products from the transport, storage, burning or disposal of waste fuel including without limitation ash, fugitive dust, fly ash, bottom ash, boiler slag, flue gas desulfurization materials, cenospheres, scrubber residues and any other by-products of waste burning, defined or regulated pursuant to present or future applicable Environmental Laws.

**1.02    Rules of Usage**

The following rules of usage shall apply to this Agreement unless otherwise required by the context or unless otherwise specified herein:

(a) *Singular and Plural*. Definitions set forth herein or in any other document shall be equally applicable to the singular and plural forms of the terms defined.

(b) *Masculine and Feminine*. Definitions set forth herein or in any other document utilizing the masculine shall include the feminine and neuter, as the context requires.

(c) *Section References*. References in this Agreement to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits in or to this Agreement.

(d) *Headings*. The headings, subheadings and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect the meaning, construction or effect of any provision hereof.

(e) *References to Persons*. References to any Person shall include such Person, its successors and permitted assigns and transferees.

(f) *Agreements as Amended*. Reference to any agreement means such agreement as amended, supplemented or otherwise modified from time to time in accordance with the applicable provisions thereof.

(g) *Laws as Amended*. References to any Law includes any amendment or modification to such Law and any Law enacted in substitution or replacement thereof.

(h) *Hereunder, etc*. When used in any document, words such as "hereunder," "hereto," "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of the applicable document and not to any particular article, section, subsection, paragraph or clause thereof.

(i) *References to "Including."* References to "including" means including without limiting the generality of any description preceding such term and for purposes hereof the rule of ejusdem generis shall not be applicable to limit a general statement, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned.

(j) *Accounting Terms*. All terms of an accounting or financial nature shall be construed to be in accordance with GAAP.

## ARTICLE 2 RELATIONSHIP OF OWNER AND OPERATOR

### 2.01   Status of Operator

(a) *Independent Contractor*. Except as otherwise provided in this Agreement, Operator shall perform and execute its obligations under this Agreement as an independent contractor to Owner and shall not be an agent or employee of Owner. Nothing contained in this Agreement shall be construed as constituting a joint venture or partnership between Owner and Operator.

(b) *Limitations on Authority*. Unless previously expressly approved in writing by Owner, Operator, or any agent, representative or contractor of Operator, shall not:

  i.   Except as may be required in the event of an Emergency, make any expenditures with

respect to the Facility or the O&M Services that exceed Ten Thousand US Dollars ($10,000 USD), except in conformity with the Annual Budget and Annual Operating Plan or as authorized by Owner's Representative;

ii.  Sell, lease, pledge, mortgage, convey or make any license, exchange or other transfer or disposition of any property, assets of Owner or any interest therein comprising any part of the Facility; provided, however, that Operator shall have the authority to sell or otherwise properly dispose of such property or assets as Operator shall determine to be necessary or appropriate to its proper performance of the Services in the ordinary course of the Facility's business.  Subject to any financing agreements, the foregoing shall not apply to the disposal, by Operator, of worn out Facility parts that have been replaced by Operator under the terms of this Agreement.  The proceeds of any authorized sale or disposition shall be for the account or benefit of Owner;

iii.  Settle, compromise, assign, pledge, transfer, release or consent to the compromise, assignment, pledge, transfer or release of, any claim, suit, debt, demand or judgment against or due by, Owner, or submit any such claim, dispute or controversy to arbitration or judicial process, or stipulate in respect thereof to a judgment, or consent to do the same or commence any litigation, action, arbitration or other proceeding on behalf of Owner; or

iv.  Initiate or respond to any complaint or dispute resolution under or negotiate with any party to any contract associated with the Facility.

v.  Amend, modify, terminate, or waive any provision of any of the Facility Agreements or suspend performance of any of the Facility Agreements, except to the extent necessary to avoid immediate danger to Persons or property, or to comply with any applicable Law. Terminate any of the Key Personnel, provided that Operator may, without Owner's consent, terminate any of the Key Personnel for material or reoccurring violations of Site Procedures.

## ARTICLE 3 OPERATOR RESPONSIBILITIES

### 3.01  Transition Period Services

(a)  Commencing Notice To Proceed Date through and including the day preceding the Takeover Date (the "**Transition Period**"), Operator shall perform the Transition Period Services.

(b)  Unless stated otherwise in this Agreement, Operator shall complete all Transition Period Services, to the extent practicable, on or before the Takeover Date or such later date as Owner and Operator may have budgeted for, planned on, or otherwise agreed to in writing.  To the extent Transition Services are not completed during the Transition Period, Operator shall complete such Transition Services during the Operational Period.

### 3.02  Operational Period Services

From and including the Takeover Date through expiration or termination of this Agreement (the "**Operational Period**"), Operator shall perform the Operational Period Services. Care, custody and control of the Facility shall pass from Owner to Operator on the Takeover Date; provided, that title and risk of loss with respect to the Facility shall, notwithstanding the foregoing, remain solely vested in Owner at all times.

**3.03 Site Procedures**

Operator shall perform all O&M Services in accordance with the procedures established by Operator for the Facility and provided to Owner in advance of implementation, including those relating to safety, security and fire prevention (the "**Site Procedures**"). Operator shall establish and maintain a safety program which shall be incorporated into the Site Procedures and designed so that the O&M Services will be performed in a safe manner that is cognizant of fire protection principles and in accordance with all Applicable Laws governing safety.  Operator shall require all personnel and subcontractors to comply with the Site Procedures.

**3.04 Training**

Operator shall insure that the Facility Work Force is trained so as to enable each member of the Facility Work Force to perform their assigned functions as required and enable Operator to comply with its obligations under this Agreement. Such training shall include fire prevention, health, safety, environmental and regulatory matters. Operator shall establish and maintain a regular training program, which shall be maintained and updated, as necessary, throughout the Term of this Agreement.  All new personnel employed by Operator shall be trained by Operator pursuant to the training program.

**3.05 Standards of Performance**

(a) Operator shall perform the O&M Services in compliance with Prudent Industry Practice, Applicable Laws, Permits, Site Procedures, and Facility Agreements ("**Operating Standards**"),. Operator shall promptly notify Owner of any known or potential non-compliance with Operating Standards. Operator shall coordinate with Owner to permit inspections of the Facility that are currently or hereafter may be applicable to the Facility by any Governmental Authority under any Applicable Law.

(b) If any Changed Circumstance, either alone or taken together with any other Changed Circumstance, increases or will increase the costs for Operator to perform the O&M Services, then the Operator shall be entitled to receive additional compensation from Owner in such amounts as are necessary to place the Operator in the same position as it would have been in but for the occurrence of such Changed Circumstance.  The Parties shall attempt to agree on the amount payable to Operator and whether it is to be paid by way of a lump sum, a change to the fees or otherwise.  If the Parties are unable to reach agreement on the amount of the additional compensation payable or the manner in which it is payable, then Owner shall pay such amount it deems reasonably necessary , subject to confirmation through dispute resolution in accordance with Article 15.

**3.06 Operator Permits**

Subject to Owner's obligation under Section 4.05 to maintain all Permits and obtain and maintain all additional permits, licenses, consents and authorizations necessary from Governmental Authorities for the ownership, operation and maintenance of the Facility, Operator shall be required to obtain and maintain, at its expense, all permits, licenses, consents and authorizations that are specifically required to be held by Operator in order for Operator to perform the O&M Services.

**3.07 Data**

(a) *Records to be Maintained*. Operator shall prepare and maintain legible operating logs, data, records and reports documenting the operation and maintenance of the Facility. Such data, records and reports shall include meter and gauge readings, maintenance records, and fuel

records and performance data and shall otherwise include all measurements and records which may be required by Applicable Law, Facility manuals, the Facility Agreements or as may be reasonably requested by Owner.

(b) *Records Retention*. Operator shall retain and preserve all records, reports, documents and data created in connection with the operation and maintenance of the Facility, for a period of five (5) years from the date of the creation of such record, report, document or datum; provided, that upon termination of this Agreement, Operator shall provide all such records to Owner and the obligations under this paragraph shall terminate. Notwithstanding anything herein to the contrary, where Owner is required by Applicable Law to retain records for a longer period of time, or where records relate to disputes, appeals, arbitration, litigation or the settlement of claims arising out of the performance of this Agreement, such records shall be maintained until the resolution of the matter giving rise to the longer retention requirement.

### 3.08 Books and Records

Operator shall prepare and maintain, on a current basis, proper, accurate and complete books and records and accounts of all transactions related to the operation and maintenance of the Facility in accordance with GAAP for review and use by Owner. Operator shall be responsible for accounts payable and implementing cost and accounting procedures established by or on behalf of Owner.

### 3.09 Access

Subject to compliance with the Site Procedures, Owner grants Operator, its representatives, and agents non-exclusive rights of access to the Site and Facility and ingress and egress to and from the Site at all times during the Term, as may be required in connection with the performance of the O&M Services. Operator shall allow Owner and such other persons as Owner designates in writing from time to time, to have full, unrestricted access to the Facility and all reports, information, data and documents related to the operation and maintenance of the Facility in Operator's possession at the Facility at all reasonable times. Owner and such Owner designees shall have access to all such reports, information, data and documents related to the operations of the Facility that may be in Operator's possession off site at all reasonable times upon prior written notice to Operator.

### 3.10 Employment Matters

Operator shall comply with all Applicable Laws and shall be responsible for labor relations in a reasonable manner consistent with the intent and purpose of this Agreement and the Annual Staffing Plan. Owner will direct all Owner instructions or requests to the Key Personnel.

### 3.11 Operating Reports

Operator shall furnish or cause to be furnished to Owner the operating reports described in **Appendix D**.

### 3.12 Annual Budget and Annual Operating Plan

(a) *Generally*. Not later than (i) the Takeover Date, for the first Operating Year and (ii) October 1, for each subsequent Operating Year, Operator shall prepare (x) an operating budget, (y) operating plan, and (z) staffing plan, each based upon expected capacity factor and other inputs provided by Owner. As a component of the overall operating plan, a description and schedule of operations, maintenance, major inspections and overhauls on a monthly basis for the following Operating Year. Owner shall promptly review Operator's proposed annual budgets and request in writing changes, additions, deletions and modifications to the annual budget and operating plan, and Operator shall promptly review Operator's proposed changes. Owner and Operator

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3707G8

will then meet to agree upon a final budget and operating plan for the Facility (for each Operating Year, the "**Annual Budget**", the "**Annual Operating Plan**", and "**Annual Staffing Plan**"), which shall be subject to approval in writing by both Parties. The final Annual Budget, Annual Operating Plan, and Annual Staffing Plan shall remain in effect for the Facility throughout the applicable Operating Year, subject to adjustment or revision as set forth in Sections 3.12(b) and 3.12(c).

(b)  If the Parties are unable to agree on an Annual Budget on or before the beginning of an Operating Year, the budget for such Operating Year shall be equal to, on a line item basis, the Annual Budget for the previous Operating Year, adjusted by the Escalation Quotient and adjusted to (i) delete any non-recurring operating expense incurred during the preceding Operating Year, if such non-recurring expense, in the reasonable opinion of Operator, is not expected to be incurred during the applicable Operating Year, (ii) add any non-recurring operating expense scheduled to be incurred during the applicable year and (iii) delete (without duplication of the adjustments made in accordance with (i) and (ii) of this Section 3.12(b)) the impact of any Emergency or Force Majeure that occurred during the preceding year. When an Annual Budget is approved after commencement of the Operating Year, it shall immediately become effective, and shall include any adjustments necessary to make it retroactive to the first day of the Operating Year.

(c)  *Revisions*. From time to time during each Operating Year, the Parties shall revise and update the Annual Budget and Annual Operating Plan as appropriate to reasonably account for Changed Circumstances, Emergencies, and Force Majeure.

## 3.13 Liens and Encumbrances

Operator shall keep and maintain the Facility free and clear of all liens and encumbrances resulting from acts or omissions of Operator or its subcontractors other than any of the foregoing arising (a) as a result of Owner's failure to make payments required to be made by it or (b) by operation of law for obligations not yet due and payable.

## 3.14 Litigation

Promptly upon obtaining knowledge thereof, Operator shall notify Owner of (a) any litigation, or material claim, dispute or action, whether threatened or filed, concerning the Facility, the O&M Services, the Facility Agreements or other agreements relating to either the Facility or the O&M Services; (b) any refusal or threatened refusal to grant or renew any approvals, licenses, consents or permits by a relevant Governmental Authority; or (c) any dispute with any Governmental Authority concerning the Facility, the O&M Services, the Facility Agreements or other agreements relating to either the Facility, the O&M Services or any Applicable Law.

## 3.15 Meetings

Operator and Owner shall meet on a quarterly basis on a mutually agreed upon date to review the Operating Reports with respect to the prior quarter.  In addition, Operator shall conduct meetings with Owner and other parties associated with the Facility, including Owner's Lenders, as reasonably requested by Owner.  Any such meeting may be conducted in person, by teleconference or by videoconference, as agreed by the Parties at the time.  Owner and Operator agree to conduct quarterly performance reviews to allow Owner and Operator to review the Operator's performance under the Agreement and to discuss any key issues that may be impacting the operations of the Facility.

## 3.16 Hazardous Materials

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3E3768

(a) *Collection and Removal of Hazardous Materials*. Operator shall be responsible for the proper on-site collection of any Hazardous Materials furnished, used, applied, generated or stored at the Facility as a result of Operator's performance of the O&M Services including, but not limited to, used oils, greases and solvents from flushing and cleaning processes performed under this Agreement. All activities in connection with the foregoing shall be performed in accordance with the Site Procedures. Notwithstanding the foregoing, Operator shall have no responsibility or liability whatsoever for the off-site disposal of any Hazardous Materials. For the avoidance of doubt, Operator shall assist Owner as requested in the preparation of all filings required Applicable Law for Owner's submittal to the applicable Governmental Authorities. All contracts for the transporting and disposing of Hazardous Materials to or from the Facility shall be in Owner's name and all costs associated with the transporting and disposing of Hazardous Materials to or from the Facility shall be paid directly by Owner. Owner shall be designated as the "Generator" of any Hazardous Materials disposed of off-site. In the event Operator is requested by Owner to execute any Hazardous Materials deposal manifest on behalf of Owner, the Owner hereby irrevocably appoints the Operator as Owner's agent to execute such manifest on behalf of Owner and Operator shall mark all documents to indicate the same.

(b) *Material Safety Data Sheets*. As required under all Applicable Law, Operator shall provide material safety data sheets covering all Hazardous Materials furnished under or otherwise associated with the O&M Services. Operator shall provide Owner with copies of the applicable material safety data sheets or copies of a document certifying that no material safety data sheets are required under any Applicable Law and shall determine whether any substance or material furnished, used, applied or stored in connection with the O&M Services is within the provisions of Applicable Law concerning Hazardous Materials.

## 3.17 Emergencies

In the event of an Emergency or other incident that involves the Facility or any part thereof, and endangers personnel, material property or material contract obligations, and notwithstanding any term or provision of this Agreement to the contrary, Operator, in accordance with Prudent Industry Practices, shall immediately take such action as necessary to prevent, avoid or mitigate injury, damage or loss. Operator shall notify Owner as soon as reasonably possible in the event of any Emergency or other incident at the Facility that endangers personnel or material property. In addition, Operator shall keep Owner informed of the progress in restoring the Facility to normal operation.

## 3.18 Subcontractors

Operator may engage subcontractors as it deems advisable for the purposes of performing or carrying out any of the O&M Services or its obligations under this Agreement, provided that any subcontractor providing services in excess of $25,000 shall be subject to Owner's prior approval, which shall not be unreasonably withheld, conditioned, or delayed. Neither the Operator's engagement of a subcontractor nor the performance of any O&M Services by a subcontractor shall relieve Operator of any of its obligations under this Agreement and Operator shall be solely responsible for performance of the O&M Services in all respects. Where a subcontractor is to be engaged as a Reimbursable Cost, Operator shall be solely liable for any and all amounts owed to any subcontractors. Nothing herein shall create any contractual relationship between Owner and any subcontractor engaged as a Reimbursable Cost.

**3.19 Liability Limiting Situations**

Notwithstanding anything else to the contrary in this Agreement, Operator shall not be in breach of this Agreement and shall have no liability to Owner to the extent that any occurrence, condition, or event that is the result of any of the following:

(a)   any act or omission that is committed or omitted, as the case may be, upon (a) the instruction of the Owner that does not violate Applicable Law, or (b) recommendation of Owner that does not violate Applicable Law, but presents a hazard to human health, property, or the environment, and for which, prior to Operator taking any such action, Operator has provided a written notice to Owner stating with specificity, Operator's refusal to comply with Owner's direction, and Owner's subsequent direction to Operator to proceed with such activity;

(b)   equipment or system failure or design deficiency, except to the extent such failure or deficiency was directly caused by Operator's failure to perform the O&M Services in accordance with this Agreement;

(c)   an event of Force Majeure;

(d)   Owner's disapproval of Operator's reasonable request for expenditures with respect to the Facility or the O&M Services;

(e)   Owner's failure to agree on a reasonable revision to the Annual Operating Plan requested by Operator as a result of a Changed Circumstance, Emergency, or Force Majeure;

(f)   Operator's suspension of the performance of all or any portion of the O&M Services in accordance with this Agreement; or

(g)   a material breach of this Agreement by Owner.


# ARTICLE 4 OWNER RESPONSIBILITIES

**4.01 Facility Agreements and Warranties.**

Notwithstanding anything in this Agreement to the contrary, Owner and Operator expressly acknowledge and agree that:  (i) Owner retains ultimate decision-making authority relating to the compliance with the Facility Agreements, which authority may be exercised by Owner in its discretion; provided that, except as otherwise specifically instructed by written direction from Owner to Operator, Operator shall exercise its authority and fulfill its responsibility to perform the O&M Services and (ii) Owner shall be responsible for securing recovery under any warranty or insurance claims with respect to the Facility, Equipment and Parts. Owner shall maintain all Facility Agreements necessary for the Facility to generate sufficient revenues from the Facility's operations for Owner to fully comply with its payment obligations under this Agreement.

**4.02 Payment.**

Owner shall make timely payments of sums due and payable to Operator pursuant to Article 5 of this Agreement.

**4.03 Owner Direct Costs.**

Owner shall pay directly (a) all fuel related costs and expenses, (b) all costs and expenses that are established in the Annual Budget to be paid directly by Owner, (c) all costs and expenses that are not

established in the Annual Budget unless agreed to by the Operator to be incurred as Reimbursable Cost, (d) all expenses associated with Extra Work, (e) all costs and expenses associated with Owner's obligations under this Agreement and (f) all costs and expenses in connection with the transporting or disposing of Hazardous Materials to or from the Facility.

**4.04 Availability and Use of Owner-Provided Information.**

Owner grants Operator a license to remain in effect at all times during the Term to use (i) Facility data as necessary to perform the O&M Services and (ii) the intellectual property rights granted to Owner including designs, manuals, equipment and related software for the Facility and otherwise provided to the Owner in connection with the Facility. Owner shall provide for Operator's use any reasonably requested manuals, as-built drawings, specifications, warranties, diagrams, test results and all other documents and information as are available to Owner, as the case may be, and relate to the operation and maintenance of the Facility and Equipment. Operator may rely on all such documents and information provided or disclosed to Operator by Owner in connection with the Facility and Equipment. Owner represents and warrants that it has the right to provide or disclose such documents or information to Operator and such disclosure will not conflict with, nor violate any other agreement to which Owner may be a party that would prevent Owner from providing or disclosing such documents or information.

**4.05 Governmental Authorizations.**

Owner shall secure and maintain on Owner's behalf, any and all Permits, other than the permits and authorizations that are required to be held by Operator in order for the Operator to perform the O&M Services as are referred to in Section 3.06 of this Agreement. Owner shall maintain all Permits and any additional permits, licenses, consents and authorizations as necessary for the Facility to generate sufficient revenues from the Facility's operations for Owner to fully comply with its payment obligations under this Agreement.

**4.06 Taxes.**

Owner shall pay all Taxes as may arise out of or relate to the ownership, operation or maintenance of the Facility, other than income taxes imposed on or measured by the net income, net profits or capital of Operator. Other than such income taxes, Operator shall be entitled to reimbursement of any Taxes paid by Operator arising out of or relating to Operator's performance of the O&M Services. However, for the avoidance of doubt, Owner paid Taxes include gross receipts tax levied on Operator for Reimbursable Costs reimbursement. If Owner is exempt from the payment of any applicable sales and/or use taxes or has a direct payment permit with respect to such taxes, Owner shall provide Operator with a copy of the certificate or permit, duly executed and issued by the appropriate Governmental Authority.

# ARTICLE 5 COMPENSATION AND PAYMENT

**5.01 Fees and Reimbursable Costs.**

During the Term, the Owner shall pay Operator the Fees, Labor Costs, Reimbursable Costs and Incentives as stipulated in this Section 5.01.

   a) *Transition Fee.* Operator shall be entitled to an initial transition fee of ninety-eight thousand thirty dollars ($98,030) ("**Transition Fee**").

   b) *Monthly Transition Fee.* For the Term, Operator shall be entitled to a transition fee of one

hundred three thousand two hundred thirty-six dollars ($103,236) to be billed monthly at four thousand three hundred one and 49/100 dollars ($4,301.49).

c) *Annual Management Fee.* Operator shall be entitled to an annual management fee of one hundred forty thousand dollars ($140,000) ("**Annual Management Fee**") to be billed monthly at eleven thousand six hundred sixty-six and 67/100 dollars ($11,666.67).

d) *Incentive Fee.* Subject to the terms and provisions of **Appendix E**, Operator shall be entitled to an annual incentive payment of up to thirty percent (30%) of the Annual Management Fee, based on performance criteria as defined in **Appendix E** ("**Incentive Fee**").

e) *Labor Payment.* Beginning on the Contract Effective Date and until the expiration of this Agreement, Owner shall reimburse Operator for all documented Labor Costs and Labor Burden incurred by Operator in accordance with the then effective Annual Budget and Annual Operating Plan, plus an additional 11.5% of Labor Costs for workers compensation, liability insurance, and general and administrative costs (collectively the "**Labor Payment**").

f) *Reimbursable Costs*. Beginning on the Contract Effective Date and until the expiration of this Agreement, Owner shall reimburse Operator for all Reimbursable Costs multiplied by a rate of 1.06.

**5.02 Invoicing.**

(a) *Transition Fee.* Upon receipt of the Notice To Proceed, Operator shall invoice Owner for the Transition Fee. Owner shall pay Operator within ten (10) days following receipt of such invoice.

(b) *Monthly Transition Fee*. Beginning on the Takeover Date and continuing monthly during the initial Term, on or before the first day of each calendar month, Operator shall invoice Owner for the Monthly Transition Fee.  Owner shall pay Operator within ten (10) days following receipt of such invoice.

(c) *Annual Management Fees*. Beginning on the Takeover Date and until the expiration of this Agreement, on or before the first day of each calendar month, Operator shall invoice Owner for the monthly portion of the applicable Annual Management Fee.  Owner shall pay Operator within ten (10) days of receipt following such invoice.

(d) *Labor Payment*. Beginning on the Takeover Date and until the expiration of this Agreement, Operator shall invoice the Owner in advance for two (2) months of Labor Payments set forth in the Annual Operating Plan and Annual Budget on or before the first day of each calendar month. The applicable monthly Labor Payments for the subject month shall be increased or decreased, as applicable, to the extent that the preceding month's Labor Payment was greater or less than originally invoiced.  Operator shall include the details for such reconciliation with each month's invoice.  Owner shall pay Operator within thirty (30) days following receipt of such invoice.

(e) *Reimbursable Costs*. Beginning on the Contract Effective Date and until the expiration of this Agreement, on or before the first day of each calendar month, Operator shall invoice Owner for all Reimbursable Costs incurred by Operator in the preceding month. Owner shall pay Operator within ten (10) days following receipt of such invoice.

(f) *Incentive Fee*. To the extent Operator determines that it is owed an Incentive Fee payment during any Operating Year pursuant to **Appendix E**, Operator shall invoice Owner an Incentive Fee on or before the last day of the calendar month immediately following such Operating Year. Owner

shall pay Operator any undisputed portion of the Incentive Fee within ten (10) days following receipt of such invoice.

(g) *Extra Work*. Owner shall pay Operator for all Extra Work within ten (10) days of receipt of invoice.

In the event that Owner is owed any liquidated damages or other payments pursuant to application of the provisions of Appendix E, Owner shall have the right to offset any Fees payable hereunder by the amount of any undisputed liquidated damages or other payments.

**5.03 Audit.**

During customary business hours during and for up to one (1) year after the date of an invoice, Owner may, at Owner's cost inspect, copy and audit all of Operator's books, records, accounts, ledgers, time cards, estimates, schedules, correspondence and other documents that are relevant to Operator's performance of its obligations hereunder and which relate to the performance of O&M Services covered by that invoice. Any costs or expenses incurred by Operator in connection with such inspections, copying or audits shall be reimbursed by Owner as a Reimbursable Cost. If, pursuant to such audit and review, it is determined that any amount previously paid to Operator did not constitute a due and payable item hereunder, Owner, at its option, may recover such amount immediately upon demand, with interest determined in accordance with Section 5.04, from Operator or deduct or cause to be deducted such amount from any payment that thereafter may become due to Operator hereunder, unless Operator objects to such determination. Owner's acceptance, approval and payment of Operator's invoiced charges and expenses will not affect Owner's audit rights. Notwithstanding the foregoing or anything to the contrary, Owner may not inspect, copy or audit any books, records, records, accounts, ledgers, time cards, estimates, schedules, correspondence and other documents related to any fixed-price portion of the O&M Services or Extra Work performed on a fixed-price basis by Operator. Any compensation adjustments arising out of audit shall be based upon a detailed and specific review of Operator's books and records, without the use of sampling and extrapolation.

**5.04 Interest.**

Any amount owed to either Party by the other Party shall accrue interest each day from the date that such amount is due until the date paid at the Reference Rate.

**5.05 Indexation.**

During the Term of this Agreement, the Annual Management Fee shall be escalated on an annual basis (provided that the calculation of such amount shall be made within a reasonable period of time after the commencement of each Operating Year and applied retroactively to the first day of each Operating Year) in accordance with the following formula:

$$EscFee = BaseFee \text{ x } EscFactor$$

where:

"EscFee" shall be the applicable escalated Annual Management Fee but in no event less than the Annual Management Fee paid in the prior Operating Year

"BaseFee" shall be the applicable Annual Management Fee for that Operating Year.

18

"EscFactor" shall be the greater of (a) 1.00 or (b) the result from the calculation: A/B

"A" shall equal the Escalation Index value for the year prior to the Operating Year to which such Annual Management Fee relates.

"B" shall equal the Escalation Index value for year 2020.

In the event that "A" is not available, the Escalation Index for the most recent quarter shall be used to calculate escalation of the Annual Management Fee. The invoice submitted by Operator in the month after "A" has been made available shall include a true-up adjustment (positive or negative, as the case may be) to reconcile the difference between Annual Management Fee calculated and paid using the quarterly Escalation Index and Annual Management Fee that would have been paid using "A".

# ARTICLE 6 TERM AND TERMINATION

## 6.01 Term.

This Agreement shall become effective upon the Contract Effective Date and, unless terminated earlier in accordance with its terms, shall expire on the third anniversary of the Takeover Date (the "**Term**"). Owner has the option, but not the obligation, to extend the Term by one (1) additional two (2) year period.

## 6.02 Termination for Default and/or Insolvency.

(a) *Termination by Owner*. Owner may terminate this Agreement in the event (i) of Insolvency of Operator;(ii) Operator is in material breach of this Agreement and fails to cure within thirty (30) days of notice of such breach, or if such breach is not possible to cure within thirty (30) days and Operator fails to commence such cure within thirty (30) days of notice of such breach, or fails to thereafter continue diligent efforts to complete the cure as soon as reasonably possible  (iii) for convenience by providing Operator ninety (90) days written notice of termination, and paying a termination fee of a sixty percent (60%) the Annual Management Fee if such termination occurs in the first year of the Term, and a thirty percent (30%) prorated portion of the Annual Management Fee if such termination occurs in the second year of the Term. In the event of termination by Owner under this Sections 6.02(a), Owner shall pay Operator for (a) all payments due under this Agreement through the date of such termination, and (b) if the Monthly Transition Fee has not already been paid in full at the time of termination, the remaining portion of the Monthly Transition Fee.

(b) *Termination by Operator*. Operator may terminate this Agreement in the event (i) of Insolvency of Owner or (ii) Owner is in material breach of this Agreement and fails to cure within thirty (30) days of notice of such breach, or if such breach is not possible to cure within thirty (30) days and Owner fails to commence such cure within thirty (30) days of notice of such breach, or fails to thereafter continue diligent efforts to complete the cure as soon as reasonably possible.    In the case of termination by Operator, Owner shall pay Operator (i) for all payments due under this Agreement through the date of such suspension and/or termination; (ii) a demobilization payment equal to the total of all reasonable costs and expenses incurred by Operator as a result of such

19

suspension and/or termination, including relocation costs, Labor Costs, and Labor Burden incurred with respect to Operator's Facility Work Force and any cancellation costs incurred with respect to third-party contracts plus (iii) the three (3) month pro rata portion of the then-current Annual Management Fees if the Agreement is terminated. Such amounts shall be due and payable by Owner within ten (10) days of Operator's submission of an invoice.

**6.03 Obligations Prior to Termination.**

Termination or expiration of this Agreement shall not relieve either Party of any obligation arising prior to termination.

**6.05 Obligations Prior to Expiration or Termination.**

(a) Prior to the expiration of the Agreement, or during the notice periods for earlier termination as set forth in Section 6.02, Operator shall exercise good faith and due diligence to (A) assist Owner in preparing an inventory of all supplies in use or in storage at the Facility and (B) transfer the performance of Operator's obligations under this Agreement, and, to the extent allowed by Law or the terms of the underlying contract, Operator shall assign to Owner all subcontracts it has entered into with third parties in connection with this Agreement; provided, that Operator is released from any further liability under any such assigned contract.

(b) At the written request of Owner and subject to the continued payment of Annual Management Fees and Reimbursable Costs hereunder during such period, continue to perform Operational Period Services at the Facility until the first to occur of ninety (90) days after termination or mobilization of Operator's successor.

(c) Upon ceasing to be the operator of the Facility, Operator shall cease forthwith to occupy the Facility (subject to the terms and conditions hereunder) and deliver to Owner: (A) originals of all documents, books, records and accounts of Owner in the possession of Operator at the Facility; (B) all Materials owned by Owner which are in the possession of Operator at the Facility and for which Operator has been reimbursed; and (C) all monies held by Operator as agent for or to the order of or otherwise on behalf of Owner; provided Owner is not in default of its payment obligations under the Agreement.

# ARTICLE 7 LIMITATION OF LIABILITY

**7.01 No Consequential Damages.**

(a) IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT, TORT LIABILITY (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE SHALL OPERATOR, ANY OF ITS AFFILIATES OR ANY OF ITS OR THEIR DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, MEMBERS, MANAGERS, PARTNERS, SHAREHOLDERS OR REPRESENTATIVES BE LIABLE TO OWNER OR ANY THIRD PARTY BENEFICIARY OF THIS AGREEMENT FOR SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER, AND OWNER HEREBY RELEASES OPERATOR AND ITS PARENT, SUBSIDIARIES, AFFILIATES, SUBCONTRACTORS AND ITS AND THEIR DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, MEMBERS, MANAGERS, PARTNERS, SHAREHOLDERS AND REPRESENTATIVES THEREFROM.

(b) IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT, TORT LIABILITY

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3537G8

(INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, SHALL OWNER, ITS LENDERS OR ANY OF ITS AFFILIATES, OR ANY OF ITS OR THEIR DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, MEMBERS, MANAGERS, PARTNERS, SHAREHOLDERS OR REPRESENTATIVES BE LIABLE TO OPERATOR FOR SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER, AND OPERATOR HEREBY RELEASES OWNER, ITS LENDERS AND AFFILIATES, AND ITS AND THEIR DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, MEMBERS, MANAGERS, PARTNERS, SHAREHOLDERS AND REPRESENTATIVES THEREFROM.

**7.02 Aggregate Limit of Liability.**

NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, EACH PARTY'S AGGREGATE CUMULATIVE LIABILITY TO THE OTHER DURING THE TERM OF THIS AGREEMENT SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE TOTAL FEES PAYABLE BY OWNER TO OPERATOR; PROVIDED, HOWEVER, THAT THIS LIMIT OF LIABILTY SHALL NOT APPLY TO, AND NO CREDIT SHALL BE ISSSUED AGAINST THAT LIMITATION FOR CASES OF (A) FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (B) INDEMNITY OBLIGATION AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO ARTICLE 8; OR (C) INDEMNITY OBLIGATION AMOUNTS PAYABLE UNDER ARTICLE 13, SUBJECT TO SECTION 13.04 OR (D) OWNER'S OBLIGATION TO MAKE PAYMENTS AS PROVIDED BY THIS AGREEMENT.

**7.03 Intent.**

The Parties intend that the waivers and disclaimers of liability, releases from liability, limitations and apportionments of liability expressed throughout this Agreement shall apply, whether in contract or in tort and shall extend to such Party's affiliates and its and their partners, lenders, shareholders, members, managers, directors, officers, employees, successors, assigns and agents to the extent the liability of any such Person arises under or with respect to this Agreement or the O&M Services. The Parties also intend and agree that this Article 7 shall continue in full force and effect notwithstanding the completion, termination, suspension, cancellation or rescission of the O&M Services or this Agreement.

**7.04 DISCLAIMER.**

EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES OR GUARANTEES TO THE OTHER, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE PROJECT, RELATED CONTRACTS OR ANY OTHER SUBJECT MATTER OF THIS AGREEMENT, AND BOTH PARTIES DISCLAIM AND WAIVE ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW.

# ARTICLE 8 INDEMNIFICATION

**8.01 Indemnity by Operator.**

To the maximum extent permitted by law, and subject to the limitations set forth in Article 7 herein, Operator shall defend, indemnify and hold harmless Owner and its Lenders and affiliates and its and their directors, managers, members, officers, agents, employees, partners, shareholders, representatives, successors and assigns (collectively, the "**Owner Indemnitees**"), from and against all liabilities, damages, claims, demands, judgments, losses, costs, expenses, suits, actions or proceedings (including reasonable

fees and disbursements of counsel), for bodily injury to or death of third parties (parties other than Owner Indemnitees) or damage to or destruction of third-party (parties other than Owner Indemnitees) properties, to the extent caused by (i) Operator's breach of the Agreement, (ii) violations of Permits, any additional permits related to the Facility, or Applicable Law to the extend caused by Operator or (iii) any negligent act or omission, gross negligence, willful misconduct, known and intentional fraud, or strict liability of Operator, any of its affiliates, officers, agents, employees or subcontractors; provided, however, that Operator shall not be required to reimburse or indemnify any Owner Indemnitee for any loss or claim to the extent such loss or claim is due to the negligence, gross negligence, willful misconduct or strict liability of any Owner Indemnitee.

**8.02 Indemnity by Owner.**

To the maximum extent permitted by law, and subject to the limitations set forth in Article 7 herein, Owner shall defend, indemnify and hold harmless Operator and its parent, subsidiaries, affiliates, subcontractors and its and their members, managers, directors, officers, agents, shareholders, employees, partners, representatives, successors and assigns (collectively, the "**Operator Indemnitees**"), from and against all liabilities, damages, claims, demands, judgments, losses, costs, expenses, suits, actions or proceedings (including reasonable fees and disbursements of counsel), for bodily injury to or death of third parties (parties other than Operator Indemnitees) or damage to or destruction of third-party property (parties other than Operator Indemnitees), to the extent caused (i) Owner's breach of the Agreement, (ii) violations of Permits, any additional permits related to the Facility, or Applicable Law, or (iii) by any negligent act or omission, gross negligence, willful misconduct, known and intentional fraud, or strict liability on the part of any Owner Indemnitees, provided, however, that Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any loss or claim to the extent such a loss or claim is due to the negligence, gross negligence, willful misconduct or strict liability of any Operator Indemnitee.

**8.03 Defense of Claims**

The indemnifying Party shall have the right to defend any indemnified party with counsel of the indemnifying Party's selection reasonably satisfactory to the indemnified party, with respect to any claims within the indemnification obligations hereof, provided that the indemnified party shall have the right to be represented therein by advisory counsel of its own selection; and provided further, that if the defendants in any such action include both the indemnifying Party and the indemnified party, and if the indemnified party shall have reasonably concluded that there may be legal defenses available to it which are different from, additional to or inconsistent with those available to the indemnifying Party, then the indemnified party shall have the right to select separate counsel to participate in the defense of such action on its own behalf and at the indemnifying Party's expense. An indemnified party shall give the indemnifying Party prompt written notice of any asserted claims or actions indemnified against hereunder and shall cooperate in the defense of any such claims or actions. Without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, the indemnifying Party shall not settle any claims or actions in a manner that would require any action or forbearance from action by, or result in any judgment against, any indemnified party

**8.04 Comparative Fault.**

It is the intent of the Parties that where liability under Section 8.01 or 8.02 is determined to have been joint or contributory, principles of comparative fault will be followed and each Party shall bear the proportionate cost of any loss, damage, expense and liability attributable to such Party's fault.

**8.05 Survival of Indemnities.**

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3E37G8

Notwithstanding any other provision in this Agreement to the contrary, the indemnification obligations and rights set forth in this Article 8 shall survive the expiration or other termination of this Agreement with respect to events, occurrences or conditions existing or arising on or prior to such expiration or other termination.

# ARTICLE 9 OPERATOR'S REPRESENTATIONS

Operator represents to Owner as follows:

### 9.01 Standing.

Operator is a company duly organized, validly existing and in good standing under the laws of the United States and is duly qualified to do business in and is in good standing in each other jurisdiction in which such qualification is required, except where the failure to so qualify would not have a material adverse impact on Operator's ability to perform its obligations under this Agreement.  Operator has the power and authority to execute and deliver this Agreement and perform its obligations hereunder. The execution, delivery and performance of this Agreement have been duly authorized by all requisite action of Operator and will not violate any provision of any Applicable Law, Operator's certificate of formation or operating agreement or any indenture, agreement or instrument to which Operator is a party, or by which Operator or its property may be bound or affected.

### 9.02 Solvency.

Operator is solvent and possessed of sufficient working capital to perform its obligations under this Agreement.

### 9.03 Skill and Experience.

Operator has (either directly or through its subcontractors) all the required authority, ability, skill, experience and capacity necessary to perform the O&M Services all in accordance with the Operating Standards.

# ARTICLE 10 OWNER'S REPRESENTATIONS

Owner represents to Operator as follows:

### 10.01 Standing.

Owner is a company duly organized, validly existing and in good standing under the laws of the United States and is duly qualified to do business in and is in good standing in each other jurisdiction in which such qualification is required, except where the failure to so qualify would not have a material adverse impact on Owner's ability to perform its obligations under this Agreement. Owner has the power and authority to execute and deliver this Agreement and perform its obligations hereunder. The execution, delivery and performance of this Agreement have been duly authorized by all requisite action of Owner and will not violate any provision of any Applicable Law, Owner's certificate of formation or operating partnership agreement or any indenture, agreement or instrument to which Owner is a party, or by which Owner or its property may be bound or affected.

### 10.02 Solvency.

Owner is solvent and possessed of sufficient working capital to perform its obligations under this Agreement.

# ARTICLE 11 FORCE MAJEURE

## 11.01 Force Majeure.

The term "**Force Majeure**," as used in this Agreement, means causes or events that are reasonably unforeseeable, that are beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure, that prevent or make performance of a Party's obligations under this Agreement or with respect to the Facility impractical or (ii) delay the performance of a Party's obligation under this Agreement, which include without limitation acts of God, sudden actions of the elements such as floods, earthquakes, hurricanes or tornadoes; sabotage; vandalism beyond that which could reasonably be prevented; terrorism; war; riots; fire; explosion; blockades; insurrection; strike; slow down or labor disruptions (even if such difficulties could be resolved by conceding to the demands of a labor group); pandemic, epidemic or plague and actions by any Governmental Authority taken after the Takeover Date (including the adoption or change in Law imposed by such Governmental Authority or failure of a Governmental Authority to act on a timely basis. The term Force Majeure does not include:  (a) any acts or omissions of any third party, including any vendor, customer or supplier of Operator, unless such acts or omissions are themselves excused by reason of Force Majeure; (b) strikes or other labor disputes (including collective bargaining disputes and lockouts) limited to the labor force under the control of the Party claiming Force Majeure; (c) a Party's financial inability to perform under this Agreement; or (c) changes in market conditions that affect the cost of fuel, Equipment or Parts.

## 11.02 Applicability of Force Majeure.

(a) Neither Party shall be responsible or liable for any delay or failure in its performance under the Agreement, nor shall any delay, failure or other occurrence or event become a default under this Agreement, to the extent such delay, failure, occurrence or event is substantially caused by conditions or events of Force Majeure; provided, that: (1) the non-performing Party gives the other Party prompt written notice describing the particulars of the occurrence of the Force Majeure; (2) the suspension of performance is of no greater scope and of no longer duration than is required by the Force Majeure; (3) the non-performing Party proceeds with reasonable diligence to remedy its inability to perform and provides weekly progress reports to the other Party describing actions taken to end the Force Majeure; and (4) when the non-performing Party is able to resume performance of its obligations under this Agreement, that Party shall give the other Party written notice to that effect.

(b) Except as otherwise expressly provided for in this Agreement, the existence of a condition or event of Force Majeure shall not relieve the Parties of their obligations under this Agreement to the extent that performance of such obligations is not precluded by the condition or event of Force Majeure. Notwithstanding the foregoing, a Force Majeure event shall not relieve Owner of its payment obligations under the Agreement.

## 11.03 Limitations on Effect of Force Majeure.

In no event will any delay or failure of performance caused by any conditions or events of Force Majeure extend this Agreement beyond its stated term.  If any delay or failure of performance caused by conditions or events of Force Majeure continues for an uninterrupted period of three hundred sixty-five (365) days from its occurrence or inception, as noticed pursuant to this Article 11, the Party not claiming Force Majeure may, at any time following the end of such three hundred sixty-five (365) day period, terminate this Agreement upon written notice to the affected Party, without further obligation by either Party except as to costs and balances incurred prior to the date of such termination.  The Party not claiming Force Majeure may, but shall not be obligated to, extend such three hundred sixty-five (365) day period, for such additional time as it, at its sole discretion, deems appropriate, if the affected Party is exercising due diligence in its efforts to cure the conditions or events of Force Majeure.

# ARTICLE 12 INSURANCE

## 12.01 Operator's Insurance Coverage.

(a) *Generally.* Operator shall maintain the insurance set forth below and all insurance that may be required under Applicable Laws. Upon request, Operator shall furnish to Owner a completed certificate of insurance coverage and which specifically requires thirty (30) calendar days' prior notice to Owner of cancellation or termination of any such insurance policy.  Review of the Operator's insurance by Owner shall not relieve or increase the liability of Operator.

(b) *Coverage.* Throughout the term of this Agreement, Operator shall maintain with insurance carriers authorized to do business in the jurisdiction covering the Facility, the following insurance coverage:

   (i) *Workers' Compensation and Employer Liability*:  Operator shall comply with and maintain Workers' Compensation and Employer Liability Insurance as required by the appropriate Government Authority to the full statutory limits.  Employer Liability shall be provided at limits of $1,000,000 per accident /policy limit.

   (ii) *Comprehensive General Liability Insurance*:  including Completed Operations, Contractual and Personal Injury Liability with a combined single limit of not less than $5,000,000 PHP. Such insurance shall name Owner as an additional insured and shall contain a waiver of subrogation in favor of Owner.

   (iii) *Automobile Liability Insurance for all Operator-owned, -hired and non-owned automobiles*:  Operator's General Liability Insurance and Automobile Liability Insurance with a combined single limit of not less than $1,000,000 which shall be primary and noncontributory with any insurance carried by the Owner. Such insurance shall name Owner as an additional insured, and shall contain a waiver of subrogation in favor of Owner.

## 12.02 Owner's Insurance Coverage.

(a) *Generally.* Owner shall maintain the insurance set forth below and all insurance that may be required under Applicable Laws. Owner shall furnish to Operator a completed certificate of insurance coverage and which specifically requires thirty (30) calendar days' prior notice to Operator of cancellation or termination of any such insurance policy.  Review of the Owner's insurance by Operator shall not relieve or increase the liability of Owner.

(b) *Coverage.* Throughout the term of this Agreement, Owner shall maintain with insurance carriers authorized to do business in the jurisdiction covering the facility, the following insurance coverage:

   (i) *Workers' Compensation and Employer Liability*:  Owner shall comply with and maintain Workers' Compensation and Employer Liability Insurance as required by the appropriate Government Authority to the full statutory limits.  Employer Liability shall be provided at limits of not less than $1,000,000 per accident/ policy limit.

   (ii) *Comprehensive General Liability Insurance*:  insuring against liability for death of, or loss, injury or damage to, the person or property of others.  Such insurance shall have a combined single limit of not less than $5,000,000. Such insurance shall be endorsed to include a waiver of subrogation in favor of Operator Indemnitees.

   (iii) *Automobile Liability Insurance*:  covering bodily injury and property damage with a

25

combined single limit of not less than $1,000,000 for all owned, hired or non-owned vehicles purchased, or leased by Owner for use in connection with the operation and maintenance of the Facility.

(iv) *Property and Equipment Insurance*:  Owner shall maintain all risk property and equipment insurance against all risks of physical loss or damage to the Facility, Equipment and all Owner equipment and/or property contained therein for the full replacement value of the Facility, Equipment and, all such Owner equipment and/or property, including business interruption insurance.  Deductibles, coinsurance and/or penalties associated with such insurance, if any, will be the sole responsibility of the Owner.  Such insurance shall be endorsed to include a waiver of subrogation in favor of Operator Indemnitees.

(v) *Pollution Liability Insurance*:  Owner agrees to obtain and maintain pollution liability insurance in the amount of at least $10,000,000 covering sudden, accidental, and gradual releases of Hazardous Materials. Such insurance shall be as primary and non-contributory as to all pollution claims in connection with the Facility, Equipment and the O&M Services.  Such insurance shall name Operator as an additional named insured and shall be endorsed to include a waiver of subrogation in favor of Operator Indemnitees.

## ARTICLE 13 HAZARDOUS MATERIALS INDEMNIFICATION

### 13.01 Indemnification for Pre-Existing Hazardous Materials.

Notwithstanding anything else herein to the contrary, Owner shall defend, protect, indemnify, and hold Operator Indemnitees harmless from any and all liability associated with or arising from the presence of any Hazardous Materials that existed on the Facility Site on or before the Takeover Date.  This Section 13.01 shall survive the expiration or other termination of this Agreement with respect to events, occurrences or conditions existing or arising on or prior to such expiration or other termination.

### 13.02 Owner's Indemnity.

Notwithstanding anything else herein to the contrary, Owner shall defend, protect, indemnify, and hold Operator Indemnitees harmless from any and all liability associated with or arising from the presence, release, storage, generation or disposal of any Hazardous Materials, except to the extent such liability is caused directly by the negligence, gross negligence, or willful misconduct of Operator while performing the O&M Services.  This Section 13.02 shall survive the expiration or other termination of this Agreement with respect to events, occurrences or conditions existing or arising on or prior to such expiration or other termination.

### 13.03 Operators's Indemnity.

Operator shall defend, protect, indemnify, and hold Owner Indemnities harmless from any and all liability associated with or arising from the release, storage, generation or disposal of any Hazardous Materials to the extent caused directly by the negligence, gross negligence or willful misconduct of Operator while performing the O&M Services. This Section 13.03 shall survive the expiration or other termination of this Agreement with respect to events, occurrences or conditions existing or arising on or prior to such expiration or other termination.

**13.04 Insurance.**

For purposes of this Article 13, the Parties will claim against the insurance coverage Owner is required to maintain under Section 12.02(b)(v) for events for which insurance is available and shall only be entitled to recovery under the indemnification provisions in Article 13 to the extent that such insurance when available does not satisfy in full the claim for which indemnification was sought; provided that, for the avoidance of doubt, any amounts not covered by insurance (including any insurance deductible) shall be paid by the indemnitor under Article 13, as the case may be, with respect to such claim.

# ARTICLE 14 TITLE AND RISK OF LOSS; DOCUMENTS AND DATA

**14.01 Title and Risk of Loss.**

Title and risk of loss to all Materials and other items purchased or obtained on behalf of Owner shall pass immediately to and vest in Owner upon the passage of title under the contract governing such purchase.

**14.02 Documents and Data.**

Operator may rely on all documents and information provided or disclosed to Operator by Owner, its affiliates, and its and its affiliates' directors, managers, members, officers, agents, employees, partners, shareholders and representatives.  Owner represents and warrants that it and its affiliates have the right to provide or disclose such documents or information to Operator in connection with the performance of the O&M Services and such disclosure will not conflict with, nor violate any other agreement to which Owner or its affiliates may be a party that would prevent Owner or  its affiliates from providing or disclosing such documents or information.

# ARTICLE 15 DISPUTE RESOLUTION

**15.01 Dispute Notice.**

For any dispute arising under this Agreement (a "**Dispute**"), within ten (10) days following the delivered date of a written request by either Party, each Party shall appoint a representative (individually, a "**Party Representative**", together, the "**Parties' Representatives**") and the Parties' Representatives shall meet, negotiate and attempt in good faith to resolve the Dispute quickly, informally and inexpensively. If the Parties' Representatives cannot resolve the Dispute within thirty (30) Days after commencement of negotiations, within ten (10) days following any written request by either Party at any time thereafter, each Party Representative: (a) shall independently prepare a written summary of the Dispute describing the issues and claims, (b) shall exchange its summary with the summary of the Dispute prepared by the other Party Representative, and (c) shall submit a copy of both summaries to a senior officer of the Party Representative's Party with authority to irrevocably bind the Party to a resolution of the Dispute. Within ten (10) days after receipt of the Dispute summaries, the senior officers for both Parties shall negotiate in good faith to resolve the Dispute.  If the Parties are unable to resolve the Dispute within fourteen (14) days following receipt of the Dispute summaries by the senior officers, either Party may  refer the Dispute to binding arbitration in accordance with Section 15.02 below.

**15.02 Arbitration.**

Each Party shall have the right by giving written notice to the other Party to refer a Dispute to binding arbitration if the Parties are unable to resolve such Dispute after the time described in Section 15.01 above.

The written notice shall identify the name and address of the arbitrator appointed by the Party giving notice and the points of dispute. The arbitration shall be conducted by one (1) arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be held in Atlanta, Georgia, or such other location as mutually agreed upon by the Parties. The decision of the arbitrator shall be final and binding upon both Parties and may be entered in any court having jurisdiction thereof. Neither Party shall seek recourse to a law court or other authorities to appeal for revisions of such decision. Each Party shall be liable for its own attorneys' fees and other litigation expenses. AAA and arbitrator fees and expenses for the arbitration shall be shared equally. On request of either Party, a transcript of the hearings shall be prepared and made available to the Parties.

## ARTICLE 16 INTELLECTUAL PROPERTY

**16.01** Owner understands, acknowledges and agrees that Operator has created or acquired rights in certain intellectual property, including without limitation various, concepts, methodologies and techniques, models, templates, reports, manuals, processes, procedures, software, user interfaces and screen designs, general purpose consulting and software tools, and methods of operation of systems (collectively, "**Operator Intellectual Property**"). Operator retains sole ownership of Operator Intellectual Property, and grants Owner a limited license to use such Operator Intellectual Property during the Term, solely at the Facility, and only to the extent necessary to obtain the full benefit of the O&M Services.

**16.02** "Operator Provider Intellectual Property" shall not include any of the foregoing created expressly by Operator or its subcontractors exclusively for Owner as part of the O&M Services performed by Operator or its subcontractors for the Facility under this Agreement, ownership to which shall transfer to Owner, provided that Owner is not in default of any payment obligations under this Agreement.

## ARTICLE 17 MISCELLANEOUS

**17.01 Complete Agreement; Amendments.**

This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof, and supersedes all prior agreements and commitments with respect thereto. There are no oral understandings, terms or conditions and neither Party has relied upon any representation, expressed or implied, not contained in this Agreement.

**17.02 Amendments.**

No change, amendment or modification of this Agreement shall be valid or binding upon the Parties unless such change, amendment or modification shall be in writing and duly executed by authorized representatives of the Parties.

**17.03 Captions.**

The captions and subheadings contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained herein.

**17.04 Notices.**

Any notice, demand, offer or other instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice, demand, offer or other instrument and shall be

hand delivered or sent by registered letter, overnight courier, telephone facsimile copy or telex to the other Party at the address set forth below:

If to Owner:

| | Eagle Valley Clean Energy LLC |
|---|---|
| Attn: | General Counsel |
| Address: | 11 East 44th Street, Suite 1200 |
| | New York, NY 10017 |
| Email: | generalcounsel@greenbackercapital.com |

If to Operator:

| | PIC Group, Inc. |
|---|---|
| Attn: | CEO |
| Address: | 1000 Parkwood Circle, Suite 1000 |
| | Atlanta, GA 30339 |
| Tel: | 770-850-0100 |
| Email: | frank.avery@picgroupinc.com |

Each Party shall have the right to change the place to which notice, demand, offer or other instrument shall be sent or delivered by similar notice sent in like manner to the other Party. All notices, demands, offers or other instruments issued pursuant to this Agreement shall effective upon receipt.

**17.05 Severability.**

If any of the terms, covenants or conditions of this Agreement or the application of any such terms, covenants or conditions, shall be held invalid, illegal or unenforceable by any court or administrative body having jurisdiction, all other terms, covenants and conditions of the Agreement and their application not adversely affected thereby shall remain in force and effect; provided, however, that the Parties shall negotiate in good faith to attempt to implement an equitable adjustment in the provisions of this Agreement with a view toward effecting the purposes of this Agreement by replacing the provision that is held invalid, illegal or unenforceable with a valid provision the economic effect of which comes as close as possible to that of the provision that has been found to be invalid, illegal or unenforceable.

**17.06 Assignment.**

This Agreement shall not be assignable by either Party without the prior written consent of the other Party hereto, which consent may be given or withheld in the relevant Party's sole discretion; provided, however, that this Agreement may be assigned by either Party without the other Party's consent: (i) to any successor of such entity by merger or consolidation; or (ii) to an Affiliate of the assigning Party, subject to the assigning Party's guarantee of such Affiliate's obligations hereunder in form and substance reasonably acceptable to the other Party; and provided, further, that this Agreement may be assigned by Owner without the consent of Operator to Lender or any other financial institution as security for any financing or refinancing of the Facility. This Agreement shall be binding upon, and shall inure to the benefit of, the

successors and permitted assigns of the Parties.  Any assignment of this Agreement which is not permitted under this Section 17.06 shall be void and of no effect.

### 17.07 No Waiver.

Any failure of either Party to enforce any of the provisions of this Agreement or to require compliance with any of its provisions at any time during the pendency of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of either Party thereafter to enforce any and each such provision.

### 17.08 Financing.

Should any financing agreements require the inclusion of provisions in this Agreement, Owner and Operator will negotiate for their inclusion in good faith.

### 17.09 Applicable Law.

This Agreement shall be governed, construed and enforced in accordance with the laws of the state of Colorado, except any such laws that would direct the application of the law of another jurisdiction.

### 17.10 No Third Party Beneficiary.

This Agreement is for the exclusive benefit of the Parties and not for the benefit of any third party.  Nothing in this Agreement shall be construed to create any duty to, or standard of care with reference to, or any liability to, any person not a party to this Agreement.

### 17.11 Confidentiality.

Each Party agrees, for itself and its directors, officers, employees and representatives, to keep confidential, to not make any unauthorized use of and not to disclose to any third Person any confidential or proprietary information of the other Party disclosed to such Party prior to and during the term of this Agreement, including the terms of this Agreement (including all Appendices thereto), documents, specifications, formulae, evaluations, methods, processes, technical descriptions, reports and other data, records and information related to the performance of the Facility or the provision of the O&M Services (hereinafter the "**Confidential Information**").  Confidential Information will not include information that is or becomes available to the general public through no breach of this Agreement, information that was previously known by the receiving Party without any obligation to the disclosing Party to hold it in confidence, information that the receiving Party receives from a third Person who is free to disclose that information, information that the receiving Party develops independently without using the Confidential Information, information that the receiving Party is required by Law to disclose, and information that an authorized officer of the disclosing Party approves for release in writing.  Each Party agrees that it will only make available the other Party's Confidential Information to its directors, officers, employees and representatives who have a "need to know" in order to perform its obligations under the Agreement and provided that such individuals are made aware of and agree to be bound in favor of the disclosing Party the confidentiality obligations contained herein.

### 17.12 Representative of Operator.

Upon execution of this Agreement, Operator shall appoint an individual from its Corporate Office Personnel (the "**Operator's Representative**"), who shall be authorized and empowered to act for and on behalf of Operator concerning the day-to-day administration of this Agreement and Operator's obligations hereunder.  In all such matters (including any amendment or modification of the Agreement under Section 17.02), Operator shall be bound by the written communications, directions, requests and decisions made

by the Operator's Representative. Operator shall notify Owner in writing of such representative, and of his/her successor(s), if changed.

**17.13 Representative of Owner.**

Upon execution of this Agreement, Owner shall appoint an individual representative (the "**Owner's Representative**") who shall be authorized and empowered to act for and on behalf of Owner on all matters concerning the day-to-day administration of this Agreement and Owner's obligations hereunder. In all such matters, subject to the provisions of Section 17.02, Owner shall be bound by the written communications, directions, requests and decisions made by the Owner's Representative. Owner shall notify Operator in writing upon the appointment of the Owner's Representative, and of his/her successor(s), if changed. Owner shall have the right to station the Owner's Representative at the Facility Site.

**17.14 Dollar Amounts.**

All amounts of money in this Agreement are denominated in United States Dollars.

**17.15 Counterparts.**

This Agreement may be executed in counterparts, each of which shall be an original and all of which shall constitute the same agreement and any counterparts may be delivered by PDF via email, which shall be binding on each Party when each Party has signed and delivered one such counterpart, and which shall be equally effective for all purposes.

[signature page follows]

IN WITNESS WHEREOF, the Parties have caused this Operation and Maintenance Agreement to be executed and delivered by their duly authorized representatives effective as of the date first set forth above.

EAGLE VALLEY CLEAN ENERY, LLC

DocuSigned by:

_A23E3CC4FDE1468..._

Name:   Matthew Murphy

Title:   COO

PIC GROUP, INC.

DocuSigned by:

Frank Avery

_97045880349547A..._

Name: Frank G. Avery

Title: President & CEO

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3E37G8

## APPENDIX A – O&M SERVICES

**Transition and Operational Period Services**

Upon Notice-To-Proceed Transition Period Services, Operator will commence the O&M Services as follows:

*Transition Period Services*

Employee Hiring and On-Boarding Process:

(a) Operator will schedule a site meeting to present benefits and provide an overview of the enrollment process. Issue offer letters/benefits package
- Develop employee transition and communication plan
- Schedule site meeting to answer questions on offer
- Perform pre-employment requirements (background checks, drug testing).
- Setup payroll and benefits
- Activate employees upon Takeover Date
- Develop and implement site specific HR employee manual including administrative procedures, organizational structure, job functions, job descriptions, employee recruiting and hiring, performance appraisal, advancement and retention criteria

Environmental, Health and Safety:

(a) Develop Site-specific safety program in accordance with applicable laws and regulations

- Implement Operator's EHS Manual, which includes standard procedures, plans and policies for the safe operation of the Facility

- Develop and implement Site specific safety plan and site specific health and safety procedures

- Develop and implement EHS key performance indicators (KPI's) and monthly tracking and report templates

- Procure required safety equipment as a Reimbursable Cost

- Identify any training requirements necessary to meet regulatory compliance in the area of EHS, environmental plans/permits, etc.

(b) Develop Environmental Compliance Program for Facility Operations.

- Develop and implement any site specific environmental procedures

- Develop and implement a compliance matrix

- Develop tracking mechanism, forms and reports to ensure that all regulatory requirements are timely met

33

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E3537G8

PIC O&M Standards:

(a) Implement O&M Standards Manual
- Operations standards
    i. Site specific chemistry program
- Maintenance standards
- Administrative standards
- Training and qualification standards

Training and Qualification Programs:

(a) Implement training and qualifications standards
(b) Develop and implement any required site specific training material as Extra Work
(c) Provide O&M standards management system training to personnel, as required, for the safe and reliable operation of the facility
(d) Set up and configure the online learning management system, ESP3® specific for the Facility

Automated Data Dashboard Implementation (KPI Tracking):
(a) Operator will develop and implement a suite of automated dashboards to track KPI's.

Remote Monitoring and Operation:

(a) Setup and implement Operator's Remote Operations Center (ROC) for Remote Monitoring and Operation Services:

- Operator will install an interface at the Facility with the existing control/data acquisition systems that will allow remote monitoring and operations with the ROC via secure (encrypted) internet connections
- Owner will support Operator for the integration of the local SCADA equipment with the existing plant DCS and systems
- Operator will assess the facility and determine if there are any additional site-specific requirements such as additional hardware or sensors to support monitoring and operation of the facility (if required, additional hardware will be a Reimbursable Cost)
- Develop and implement site specific remote monitoring and operation procedures

Vendor and Community Relations:

(a) Contract Services
- Discovery will be conducted to determine all contract and vendor services that will need to be transitioned from the current operator to Operator or the Owner
(b) Community Relations:
- Meet with community leader(s) and establish ongoing relationship, if required.

Care, Custody and Control:

*(a)* Operator takes care, custody and control of the Facility on the Takeover Date.

DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A63E3E37G8

*Operational Period Services*

Upon the Takeover Date, Operator will commence Operational Period Services as follows:

Plant Management

(a)  Ensure site security is effectively in place

(b)  Maintain records regarding purchases and transactions in support of owner's accounting and reporting practices as they may be in effect from time to time.

(c)  Work with the Owner to establish periodic performance review meetings.

(d)  Comply with the terms of Owner's insurance policies at all times.

Operations and Maintenance:

(a)  Implement and comply with the O&M Standards, the administrative and management procedures manuals, emergency procedures, preventive maintenance program and computerized management system in accordance with the Agreement.

(b)  Prepare a Facility operating plan, training plan, maintenance plan and budget utilizing all the annual plans as the basis.

(c)  Maintain sufficient numbers of qualified (and, if required, licensed) personnel to perform the O&M Services required and Operator's obligations under this Agreement in connection with the operation and maintenance of the Facility.

(d)  Perform, or cause to be performed, all maintenance for the Facility in accordance with the maintenance plan and the terms of any Facility Agreement.  These would include preventative, predicative, and corrective maintenance requirements.

(e)  Prepare, in connection with the operations plan, an annual schedule of anticipated fuel use, dispatch capacity, taking into account annual operating hours and fuel usage. Advise Owner and any energy management service provider in a timely manner as to changes in fuel requirements or dispatch availability.

(f)  Carry out such periodic performance tests of the Facility as Owner may request. After analysis by Operator or other qualified Persons, recommend to Owner any remedial action which Operator considers appropriate.

(g)  Schedule, in coordination with the applicable parties to Facility Agreements, the Approved Annual Budget and Approved Annual Operating Plan, allowing sufficient lead time to arrange necessary permits/approval, Materials, third party contracts and Operator resources.  Operator shall notify Owner in advance of any planned inspections, maintenance and repairs requiring

shutdown of unit and use all reasonable efforts to schedule outages and maintenance shutdowns to minimize revenue loss and costs to Owner.  Such scheduling will be consistent with Owner's directions.  Operator shall notify Owner as soon as is reasonably practicable of unplanned maintenance or repairs resulting in shutdowns as soon as practicable after the occurrence thereof, and periodically advise Owner of the status of restoring the Facility to normal operations as reasonably requested by Owner (or required by any Facility Agreement).

(h)   Recommend modifications, repairs, replacements and improvements to the Facility and components thereof and, at Owner's request or approval, cause the same to be implemented.

(i)   Implement the developed emergency response plan and fire prevention plan for the Facility.

(j)   Cooperate in the provision of information to authorized representatives of Owner including, without limitation, Owner's Representative and the Lenders and Owner's accountants and attorneys.

(k)   Maintain the Facility Site and all structures on the Facility Site in a good, safe, clean and orderly condition;

(l)   Cause to be maintained:

- All roads, yards, walkways and utilities on the Facility Site;

- Tool room, equipment, instruments and rolling stock pertaining to the Facility;

- Fire protection and safety equipment; and

- Environmental control systems.

(m)   Perform any other services reasonably necessary to complete the Services and its other obligations.

(n)   Provide information and other reasonable assistance at Owner's request regarding operation and maintenance of the Facility to assist Owner in its reporting requirements relating to the Facility under Applicable Law, including the preparation on behalf of the Owner the required reports relating to the Facility under Applicable Law.

(o)   Provide information and other reasonable assistance at Owner's request regarding operation and maintenance of the Facility to assist Owner in obtaining and maintaining the relevant Permits.

(p)   Provide monthly reports summarizing Facility operations, scheduled maintenance, routine maintenance, unscheduled maintenance and additional information reasonably required by Owner.

(q)   Report all safety, mechanical breakdown and environmental excursions to the Owner and appropriate regulatory personnel immediately, file a full report with cause and corrective action within five (5) business days or as reasonably required and review such report with Owner

(v) Ensure there are open, clear and frequent communications between Owner, Operator headquarters, and the Facility staff on employee relations issues and staffing efforts. This will be accomplished through frequent oral communications, status reports, and Facility staff meetings.

Day-to-Day Operations:

(a) Operate and manage the Facility seven (7) days per week, twenty-four (24) hours per day, in accordance with the O&M Manuals and in compliance with the O&M Agreement, the Facility Agreement, Prudent Industry Practices, and all Applicable Laws and Permits;

(b) Supervise, manage, direct and control the Facility Work Force in connection with the day-to-day operation and maintenance of the Facility.

(c) Prepare and maintain daily operating logs and records regarding operation and maintenance of the Facility which is to be used in preparing periodic reports for Owner.

(d) Advise Owner to pay the Facility's vendors, in a timely manner, for the goods and services they provide, unless Operator in good faith disputes any amounts due and reports such dispute to Owner, assist Owner to collect receivables and support the Owner in handling all customary transactional matters with third parties in connection with the day-to-day operations and long-term maintenance of the Facility.

(e) Administer all agreements relating to the day-to-day operation of the Facility on behalf of Owner except those Agreements where Owner explicitly retains administration rights.

(f) Take corrective maintenance actions as required to maintain dispatch schedule.

(g) Take all actions necessary or advisable in the event of an emergency to protect all Facility Work Force, the Facility and other Equipment and Materials of Owner or Operator.

(h) Perform and record periodic operational checks and test of Equipment in accordance with equipment manufacturer's recommendations, applicable Laws and Prudent Industry Practices.

(i) Test and recalibrate any scales, gauges, meters or other measuring devices.

Outage Services:

(a) Assist Owner in the management and enforcement of the service agreements (and related work) and vendor warranties and guarantees.

(b) Perform, cause to be performed, or contract for and oversee the performance of all scheduled and unscheduled outage maintenance that is necessary or desirable for the Facility.

(c) Manage, organize and supervise such contracted maintenance, repair and testing services as shall be required to carry out scheduled and unscheduled maintenance.

(d) Provide support for procurement services on behalf of Owner with respect to all Materials, supplies, parts, Equipment, vehicles, and other items and inventory necessary for the outage maintenance of the Facility, including procurement support for all parts necessary for major turbine overhauls, replacement of steam path components and other Major Maintenance activities from approved vendors that are Owner responsibility under any service agreements.

(e) Use its best efforts to schedule all outages and maintenance shutdowns to minimize loss of revenues to the Facility, and consistent with the Facility Agreements.

(f) Notify all parties required to receive notice of scheduled shutdowns pursuant to the Facility Agreements consistent with the requirements of such agreements.

(g) Develop estimates and cause analysis for equipment failures.

Training:

(a) Continue to develop and implement periodic and reoccurring training courses (related to operations, maintenance, administration, health and safety, emergency procedures and regulatory compliance).

(b) Develop and implement qualification programs and professional development paths for all plant staff in order to achieve Facility succession planning requirements.

(c) Develop an annual training plan, for third party specialized training, as part of the budgeting process which shall be subject to Owner's approval.

Inventory and Spare Parts:

(a) Review and further develop the spare Parts inventory list, obsolete inventory list, and procure, as a Reimbursable Cost, or cause to be procured through Owner, maintain, manage and care for all required spare Parts, Facility Tools, Equipment, Consumables, office equipment and any other materials necessary or appropriate to support the continuous operation of the Facility, and contract for such goods and services required for the day to day operation and Routine Maintenance of the Facility.

(b) Maintain the inventory control and tracking system for the Materials (other than Equipment) for approval by Owner and implement and maintain such inventory control and tracking system.

(c) Maintain and document inventory spare Parts, Consumables and Facility Tools and purchase replacements, as a Reimbursable Cost, in a manner reasonably predicted to avoid any shortages thereof.

(d) Upon receipt, inspect and/or test Materials and Consumables to the Facility Site, in accordance with Prudent Industry Practices and the terms of the Facility Agreements, note and manage any

evident defects or deviations appropriately, and promptly return rejected items to the applicable vendor or manufacturer or supplier for credit or replacement.

(e)   Review spare Parts usage and revise stocking levels and reorder points.


Health and Safety:

(a)   Conduct daily, weekly, monthly, annual training as appropriate to ensure all staff are aware of hazards associated with their scopes of work and understand the actions required to eliminate or control the risks.

(b)   Provide, as a reimbursable expense, the personnel protective equipment necessary,

(c)   Set a target of zero accidents at the Facility.

(d)   Identify and implement any ongoing and annual refresher training requirements necessary to meet regulatory compliance in accordance with applicable Facility safety, health, environmental plans/permits, OSHA regulations, etc., and determine what additional training, reviews, inspections, visits, etc. are appropriate to ensure employees are aware of appropriate local, state and federal requirements.

(e)   Conduct root cause analysis of any accidents/injuries.

(f)   Conduct an annual EHS Audit.


Environmental:

(a)   Maintain monthly/annual compliance calendar.

(b)   Lead the monthly compliance calls with representatives of the Owner

(c)   Collect data for reporting, generating and submitting all environmental reports in accordance with Applicable Law and relevant Permits. Submit all environmental reports to Owner for final approval and submittal to the regulatory agency by the required date.

(d)   Review monthly emissions data; CEMS downtime and perform quality assurance of the data.

(e)   Inspect and maintain continuous emissions monitoring systems (CEMS), data acquisition and handling systems (DAHS), and air pollution control equipment.

(f)   Monitor periodic performance testing as required.

(g)   Create and track corrective actions identified as a result of corporate compliance EHS audits.

(h)   Conduct training as needed (SPCC, SWPPP, waste, etc.).

(i)   Notify the appropriate regulatory bodies for any permit violations or exceedances with approval from Owner.

(j)   Create PMs to assign responsibilities and track environmental compliance.

(k)  Provide corporate guidance and oversight for EHS programs to the plant staff.

(l)  Properly characterize, manage, store, and dispose of hazardous and universal wastes on behalf of the Owner.

(m)  Properly manage, store, and dispose of used oil and oily rags.

(n)  Conduct periodic SPCC Plan inspections if required.

(o)  Conduct Stormwater Pollution Prevention Plan (SWPPP) inspections if required.

(p)  Conduct and prepare required periodic monitoring for SWPPPs, wastewater discharge permits, and groundwater permits if required.

(q)  Develop, as a reimbursable expense, the QAQC Manual for the continuous emissions monitoring system (CEMS), if required by permit.

(r)  Prepare and submit Discharge Monitoring Reports (DMRs) as applicable.

(s)  Prepare, review, and submit Annual Reports for discharge of wastewater if required.

(t)  Set a target of zero environmental releases and other incidents.

(u)  Train plant personnel and promptly implement the required procedures related to changes in compliance requirements.

(v)  Administer the environmental training programs in accordance with the training manual and Facility environmental program and implement a self-audit system that will periodically evaluate the effectiveness of these programs/procedures in place and enhance procedures/programs where required.

(w)  Conduct an annual EHS audit.


Home Office Support:

(a)  Provide technical support, to the extent Operator is able, using its then existing employees for solving operation and maintenance issues, problems or concerns with regard to the Facility, and to the extent Operator's employees are unable to provide appropriate or necessary support, arrange for such support.

(b)  Provide information regarding changes in Applicable Law that are likely to impact Facility operations or maintenance

(c)  Obtain and maintain the insurance required by the Agreement and provide necessary insurance certificates to Owner.

(d)  Conduct periodic on-site audits by area experts of all the O&M related programs and policies that will evaluate their effectiveness.

(e)  Provide human resources, health and safety, and environmental oversight to ensure regulatory compliance.

(f)     Keep current with the operations, maintenance, human resources, health, safety and environmental compliance regulations applicable to the site.

(g)     <u>Remote Operations Center services</u>:

- Operator will provide remote monitoring from its ROC with qualified and experienced process plant operators.
- Operator will monitor plant data and alarms to identify plant issues and report them to local personnel for attention.
- Operator will evaluate equipment performance and availability to identify issues and provide recommendations for improvement

# APPENDIX B – Reserved

# APPENDIX C – FACILITY WORK FORCE

**Key Personnel:**

- Plant Manager
- Business Manager

**Facility Work Force:**



DocuSign Envelope ID: EBC0E8E5-30A6-4E8D-918A-C2A53E537G8

# APPENDIX D – OPERATING REPORTS

Operator shall provide Owner with operating reports substantially in the form of the attachments to this Appendix D.

Monthly O&M Report:

The report shall include all the components in substance and form relative to plant management, operations and maintenance.  Prior to finalizing the format of the report, the Operator shall seek and obtain Owner approval.  From time to time, Owner may request modifications to the format and contents of the report to include or exclude certain components, which Operator shall accommodate.

Budget Variance Analysis:

The Operator shall develop and report the budget variance analysis on (a) a monthly basis; and (b) a year to-date basis.  Immediately after the Effective Date of the Agreement, the Owner and Operator shall agree on the various general ledger budget components that are to be tracked and reported as part of the budget variance analysis.  The final version of the template shall be provided by the Operator to Owner for Owner approval at least one week prior to the Takeover Date.  The budget variance analysis report shall include (i) explanation for the variance; and (ii) charts by major categories by month and year to-date.

Ad hoc Report:

From time to time, Owner may require Operator to develop certain reasonable ad hoc reports.  The Owner and Operator shall discuss and jointly develop the format and contents of the report to suit the need.

## APPENDIX E – INCENTIVE FEE

The Operator Performance Metrics with weightings to be used to calculate the Operator Incentive Fee or LD are shown below.  The maximum Incentive Fee or maximum LD will be capped at 30% of the Management Fee. This program will be based on an Operating Year as defined in this Agreement.  For any Operating Year that is less than twelve (12) calendar months, the bonus or LD amounts will be pro-rated.

| Performance Metrics | Weighting (%) | |
|---|---|---|
| | | |
| Environmental Compliance | 25% | |
| O&M Budget Performance | 10% | |
| Plant Reliability – Forced Outage Factor | 40% | |
| Planned Outage Schedule Compliance | 25% | |
| *Total Bonus Potential:* | *100%* | |
| *Total LD Potential:* | *100%* | |

The description and criteria for each of the performance metrics is detailed below.

## 1.  Environmental

The Environmental performance metric is weighted at twenty-five percent (25%) of the overall bonus or LD. This incentive is be based on the following criteria:

- Facility receives no NOVs from any environmental enforcement entity that results in a fine during the applicable calendar year and,
- All Title V and Water Discharge reports submitted in a timely manner with all appropriate tests and data captured.

## 2.  O&M Budget Performance

The O&M Budget performance metric is weighted at ten percent (10%) of the overall bonus or LD. This incentive is based on the variance between the approved annual budget (Plan) versus the actual O&M expenses (Actuals) as per the following table:

| Actual Expenses | Incentive Result |
|---|---|
| < 97% of Plan | +10% |
| 97% to 100% of Plan | +5% |
| Equal to Plan | 0% |
| 100% to 103% of Plan | -5% |
| >103% of Plan | -10% |

Notes:
- O&M Budget performance, monthly and year-to-date expenditures, shall be calculated and reported at the end of each month and included in the Operator Performance Report.
- At the end of each month, the Parties shall meet and agree on actual expenditures. From time to time, there may be certain expenditures that are deemed outside of Operator's control and may be excluded from the budget performance calculation.

## 3. Plant Reliability (Forced Outage Factor)

The Plant Reliability performance metric, measured as Forced Outage Factor, is weighted at forty percent (40%) of the overall bonus or LD. This incentive is based on the ratio of the number of hours that the plant is in a forced outage or an unplanned event divided by the Period Hours during the applicable calendar year. For reference, the Eagle Valley Capacity Factor = (Design 95%), (PPA 88%). The method for calculating the Forced Outage Factor (FOF) shall be based on the following equation:

**Forced Outage Factor (FOF) = FOH/PH X 100%**

| Reliability Factor | Incentive Result |
|---|---|
| ≤ 2% | +30% |
| ≤ 4% down to 2% | +15% |
| 4% to 5% | 0% |
| ≥ 5% up to 7% | -15% |
| ≥ 7% | -30% |

**4. Planned Outage Schedule Compliance**

The Planned Outage Schedule Compliance metric is weighted at twenty-five percent (25%) of the overall bonus or LD. This incentive is based on completing a planned outage within the approved scheduled timeframe as per the approved Annual Operating Plan or per any approved revision to the schedule.

**Change Provisions**

From time to time (annually), prior to the commencement of an Operating Year, the Operator and Owner may discuss and mutually agree to either modify the categories and/or change the initial category weightings. Any such changes shall be included as an amendment to this Agreement and shall be executed by duly authorized representatives of the Owner and Operator for it to become effective.

**Definitions.**

"Forced Outage Hours" (FOH) shall mean all hours that the unit was unavailable to meet dispatch, not counting planned outage hours.

"Period Hours" (PH) shall mean the total hours during the Operating Period.

"Planned Outage Hours" (POH) shall mean all hours that the unit was scheduled for an outage at least 30 days in advance and may include maintenance outages that are pre-approved by the owner.

# APPENDIX F – FACILITY AND FACILITY SITE

Name: Eagle Valley Clean Energy, LLC (Eagle Valley Biomass Plant)

Address:

10775 Highway 6
Gypsum, CO 81637

Boundary: The facility includes the Eagle Valley Biomass Plant within the boundaries specified in Figure F-1.

**Figure F-1: Power Plant Plot Plan**



# APPENDIX G – FACILITY AGREEMENTS

The principal facility Agreements to be supervised by Operator are:

AMENDED AND RESTATED POWER PURCHASE AGREEMENT BETWEEN
EAGLE VALLEY CLEAN ENERGY, LLC AND HOLY CROSS ENERGY

INTERCONNECTION AGREEMENT BETWEEN EAGLE VALLEY CLEAN ENERGY, LLC
AND HOLY CROSS ENERGY

TOWN OF GYPSUM, COLORADO ANNEXATION AGREEMENT AND VESTED RIGHTS
DEVELOPMENT AGREEMENT

FUEL SUPPLY AGREEMENT BETWEEN EAGLE VALLEY CLEAN ENERGY, LLC AND WEST
RANGE FOREST PRODUCTS, LLC

PRODUCT AND SERVICES SUPPLY AGREEMENT BETWEEN NALCO COMPANY, LLC AND
EAGLE VALLEY CLEAN ENERGY, LLC

PIPELINE CROSSING AGREEMENT BETWEEN EAGLE VALLEY CLEARN ENERGY, LLC
AND UNION PACIFIC RAILROAD COMPANY

COMMERCIAL PRIVATE ROAD AGREEMENT AMONG CLEARWATER VENTURES LLC,
EAGLE VALLEY CLEAN ENERGY, LLC AND UNION PACIFIC RAILROAD COMPANY

Applicable insurance and leasing agreements

Any other agreement required to operate the Facility

# APPENDIX H – PERMITS

Air Pollution Control Division – Colorado Operating Permit **14OPEA388**

State of Colorado, Division of Oil and Public Safety – Boiler Certificate

Colorado Department of Transportation State Highway Access Permit **312151**

Colorado Department of Public Health and Environment General Permit COR900000, Stormwater Associated with Non-Extractive Industrial Activity Certification Number: **COR901229**

Authorization to Discharge Under the Colorado Discharge Permit System

Any other Permit required to operate the Facility

# APPENDIX I – INITIAL ANNUAL BUDGET

## Initial Annual Budget:

Greenbacker Renewable Energy
Eagle Valley Clean Energy Facility
Siemens SST-300 13.5 MW TG, Wellons 4-Cell Biomass

First Year Budget

| Budget Category | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Management Fee** | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 11,667 | $ 140,000 |
| **Labor** | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $131,178 | $ 1,574,141 |
| Straight Time Wages | $ 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 78,120 | 937,440 |
| Overtime Wages | $ 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 14,265 | 171,186 |
| Burden | $ 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 30,047 | 360,567 |
| Incentive Pay | $ 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 8,746 | 104,948 |
| **PIC Services** | $ 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 7,017 | 84,204 |
| PIC O&M Systems Dev and Impl | $ 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 4,301 | 51,618 |
| External Consulting and Software | $ 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 1,521 | 18,251 |
| Transportation and Lodging | $ 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 10,505 |
| Equipment and Material | $ 319 | 319 | 319 | 319 | 319 | 319 | 319 | 319 | 319 | 319 | 319 | 319 | 3,830 |
| **Consumables** | $ 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 81,118 |
| Bearings and Couplings | $ 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 575 |
| Diesel Fuel | $ 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 2,035 | 24,425 |
| Fittings, Hardware, Solvent, Towels, Etc. | $ 226 | 226 | 226 | 226 | 226 | 226 | 226 | 226 | 226 | 226 | 226 | 226 | 2,714 |
| General Electrical Supplies | $ 243 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 2,922 |
| General Filters ( Air, Oil & Fuel) | $ 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 1,199 | 14,390 |
| Lube Oil & Grease | $ 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 2,257 |
| Mechanical Seals, Flex Gaskets | $ 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 862 |
| Nitrogen | $ 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 2,985 |
| Replacement Tools | $ 322 | 322 | 322 | 322 | 322 | 322 | 322 | 322 | 322 | 322 | 322 | 322 | 3,860 |
| Uniforms | $ 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| Welding Supplies | $ 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 1,129 |
| **Chemicals and Water Treatment** | $ 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 10,975 | 131,698 |
| Aqueous Ammonia (SCR) | $ 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 1,705 | 20,460 |
| Cooling Tower Treatment | $ 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 1,419 | 17,023 |
| RO / Demineralization | $ 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 4,898 | 58,781 |
| Wastewater Treatment Plant Chemicals and Testing | $ 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 2,953 | 35,433 |
| **Office & Administration** | $ 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 6,665 | 79,974 |
| Administration Supplies | $ 604 | 604 | 604 | 604 | 604 | 604 | 604 | 604 | 604 | 604 | 604 | 604 | 7,250 |
| Administrative Expenses | $ 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 1,583 | 19,000 |
| Air Permits and Permitting (Air Permit and Storm Water Fees) | $ 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Coffee, Water and Misc. | $ 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Computer Hardware and Software | $ 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 2,250 |
| Freight & Postage | $ 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 1,062 |
| Mobile Telephone | $ 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 3,500 |
| Offcie Furniture | $ 201 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 2,413 |
| Printing and Reproduction | $ 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 250 |
| Repairs | $ 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 250 |
| Safety Supplies (PPE) - (Restock of PPE) | $ 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| Telecom and SCADA System | $ 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 13,000 |
| Employee PPE Benefit | $ 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Training** | $ 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| Equipment Vendor Schools | $ 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |
| Safety & Environmental (specialized local vendors) | $ 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |
| Travel & Subsistence | $ 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |
| User Group Meetings | $ - | - | - | - | - | - | - | - | - | - | - | - | - |
| Management and Leadership Training (E2D) | $ 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| **Community Relations** | $ 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| Community Relations | $ 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |
| Employee Relations | $ 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |

# Initial Annual Budget (Continued)

**First Year Budget**

| Budget Category | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Contract Services** | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 28,496 | $ 341,949 |
| Ash Disposal | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 7,082 | $ 84,986 |
| Chemical Care Services (Assumes Chemical Supply Vendor w | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 1,035 | $ 12,415 |
| Emission Testing | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 2,057 | $ 24,690 |
| Environmental Testing & Regulatory Support | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 1,792 | $ 21,500 |
| Equipment Rental | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 1,146 | $ 13,755 |
| Groundskeeping | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 408 | $ 4,900 |
| Hazardous Waste Disposal | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 4,703 |
| Janitorial Services | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 9,000 |
| Lube Oil Sampling and Analysis | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 292 | $ 3,500 |
| Pest Control | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 83 | $ 1,000 |
| Power Plant Building Maintenance | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 30,000 |
| Professional Services | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 3,667 | $ 44,000 |
| Vehicle Fuel | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 5,292 | $ 63,500 |
| Vehicle | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 10,000 |
| Waste Removal (General Trash-Classified Non-Hazardous) | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 | $ 1,500 |
| Site Security | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 1,042 | $ 12,500 |
| **Maintenance & Minor Repair** | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 18,948 | $ 227,378 |
| Air Compressor, Air Distribution & Hydraulics | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 233 | $ 2,798 |
| Ash Handling System | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 1,086 | $ 13,038 |
| Aux Boiler Routine Maintenance | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 392 | $ 4,703 |
| Boiler | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 5,945 | $ 71,337 |
| Closed Loop Cooling System | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 141 | $ 1,693 |
| Condensate/Feedwater/Steam | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 | $ 11,756 |
| Continuous Emissions Monitoring Systems | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 423 | $ 5,079 |
| Cooling Tower and Cooling Water System | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 217 | $ 2,610 |
| DCS and Control Systems | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 458 | $ 5,502 |
| Demin | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 212 | $ 2,539 |
| Electrical Switchgear | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 1,176 | $ 14,108 |
| Fire Protection and Detection Systems | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 805 | $ 9,664 |
| Fuel Systems | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 1,293 | $ 15,518 |
| Potable Water | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 165 | $ 1,975 |
| SCR/Ammonia Forwarding System (Aqueous Ammonia) | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 394 | $ 4,726 |
| Service Water | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 341 | $ 4,091 |
| Shop Equipment | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 3,762 |
| Steam Turbine Routine Maintenance | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 627 | $ 7,524 |
| Vehicle/Mobile Equipment | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 2,641 | $ 31,695 |
| Wastewater Treatment Plant | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 380 | $ 4,561 |
| **Monthly Sub Totals (Major Categories)** | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $212,955 | $ 2,555,461 |
| Bonus/LD | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 42,000 |
| **Total** | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $228,122 | $ 2,737,461 |

Note: The Initial Annual Budget provided above is preliminary. In accordance with Section 3.12(a), by the Takeover Date for the first Operating Year Operator will establish the Initial Annual Budget.